**UNITED STATES of America,
Appellee,**

**v.**

**Fred FERNANDEZ, Defendant-Appellant.**

**No. 473, Docket 71–2129.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 27, 1972.

Decided Feb. 24, 1972.

Howard J. Stechel, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E.D.N.Y., and David G. Trager, Asst. U. S. Atty., of counsel), for appellee.

Eleanor Jackson Piel, New York City, for defendant-appellant.

Before FRIENDLY, Chief Judge, and ANDERSON and MANSFIELD, Circuit Judges.

FRIENDLY, Chief Judge:

Fred Fernandez appeals, on numerous grounds, from a judgment of the District Court for the Eastern District of New York sentencing him, after trial before Judge Costantino and a jury, to two concurrent terms of twenty years for armed bank robbery, 18 U.S.C. § 2113(a) and (d). At a previous trial before Judge Bruchhausen, the jury had convicted a co-defendant but had disagreed with respect to Fernandez.

The robbery, of the First Federal Savings and Loan Association in Queens County, New York occurred on the afternoon of December 24, 1970. Four men participated; one, allegedly Fernandez, was wearing a cap and a navy blue pea jacket and was carrying a pistol which two witnesses identified as a .45 automatic. During the robbery George Pesch, a guard, was able to activate the bank's surveillance camera which produced 17 photographs of a light skinned black wearing a dark pea jacket whom the Government claims to have seen Fernandez. Although the photographs showed only the man's left side, they were reasonably clear.

On the basis of an informer's tip, FBI Agent Sweeney obtained a warrant for the defendant's arrest. Apparently it is conceded that this was issued with probable cause. Sweeney and four other agents proceeded on the morning of February 18, 1971, to the home of Fernandez' mother, also in Queens. At this point it suffices to say that the agents arrested Fernandez and seized a navy blue pea jacket, $470 in bills, a considerable amount of ammunition, and a .45 automatic pistol. On the basis of Agent Sweeney's testimony to what eyewitnesses and the confidential informant had told him and of the seizure, the surveillance photographs and a photograph of Fernandez taken after his arrest, a grand jury indicted him. Thereafter four bank employees made a photographic identification, in a manner hereafter described; two of them, Mrs. Kalata and Mr. Pesch, testified to this and made an in-court identification at the trial which led to the conviction here under review.

I. *The Validity of the Search and Seizure.*

The validity of the search and seizure at Mrs. Fernandez' home had been the

subject of a suppression hearing before Judge Bruchhausen prior to the first trial. The version given by Agents Sweeney, Landolfi and Terefenco was as follows:

At about 7:00 A.M., Agents Sweeney, Smith and Terefenco went to the front door of the residence; Agents Murphy and Landolfi went to the back entrance. Landolfi encountered Mrs. Fernandez, who was coming out with two dogs. He identified himself as an FBI agent, stated he had a warrant for Fred's arrest, and asked whether Fred was home. Mrs. Fernandez said "No." Landolfi called for Sweeney to come around back. Upon arriving at the back of the house Sweeney asked whether Fred was at home; Mrs. Fernandez answered in the affirmative. The two dogs then started growling and baring their teeth at the agents; Landolfi and Sweeney drew their guns in the direction of the dogs. Mrs. Fernandez told the agents she wanted to secure the dogs, since they were very vicious and would attack strangers; the agents then reholstered their guns. She went inside the house with the dogs and stayed for ten minutes. She then returned to let the agents inside and told them that Fred was upstairs in his bedroom. Sweeney and Smith ascended, found Fred sitting on the bed, and arrested him. These agents seized 37 rounds of ammunition, including .45 caliber cartridges, $470 in bills, and other items which were in plain view on a dresser next to the bed. They observed a navy blue pea jacket in a nearby open closet and also seized this. Meanwhile the other three agents were talking with Mrs. Fernandez downstairs. Landolfi told her that they had reason to believe there were weapons in the house; that they wished to make a search but did not have a search warrant; and that she had a right to require them to get one. She responded that they would find no weapons in the house. Landolfi showed and read her a consent to search form; she said she "didn't prefer" to sign it but had no objection to a search. Agent Terefenco went upstairs and found a fully loaded .45 automatic pistol and 2 clips hidden between the mattress and box spring of a bed in a room adjacent to that where Fred had been arrested—a maneuver which the Government suggests might have been performed during the agents' ten minutes wait before Mrs. Fernandez admitted them to the house. Fred later admitted at FBI headquarters that the gun was his. Mrs. Fernandez signed a form acknowledging what items were being seized.

Expectably Mrs. Fernandez gave a different version. She claimed that she was afraid when the agents drew their guns; that she asked them to produce a search warrant; that they said it was not necessary; that she let them into the house for that reason; and that she had never consented to a search.

On this appeal only the search for and seizure of the gun is seriously contested. If the judge believed the agents, the Government satisfied its burden, which we now take to be only of meeting the preponderance of the evidence test, see Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618, (1972); contrast United States v. Bracer, 342 F.2d 522, 524 (2 Cir.), cert. denied, 382 U.S. 954, 86 S.Ct. 427, 15 L.Ed.2d 359 (1965), of proving that Mrs. Fernandez' consent was "freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Even on her own version, any effect of the pulling of the guns, itself not an unreasonable response to the vicious dogs, had been dissipated by the lapse of time before the consent was sought. Nothing said or done by the agents indicated any intention to use force, although they lawfully could have in order to make the arrest if Mrs. Fernandez had refused to permit it. Determination of credibility was for the judge who saw and heard the witnesses.

## II. *The Validity of the Indictment.*

Little need be said with respect to appellant's contention that the indict-

ment was invalid because no eyewitnesses to the robbery were called before the grand jury. Despite some earlier statements that might be taken to indicate a more drastic attitude, this court's present position with respect to indictments based on hearsay is that stated in United States v. Leibowitz, 420 F.2d 39 (2 Cir. 1969); United States v. Rosenstein, 434 F.2d 640 (2 Cir. 1970), cert. denied, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971); United States v. Catalano, 439 F.2d 1100 (2 Cir.), cert. denied, 404 U.S. 825, 92 S.Ct. 56, 30 L.Ed.2d 53 (1971); and United States v. Olsen, 453 F.2d 612 (2 Cir. 1972). The grand jury had a considerable quantity of non-hearsay evidence—the surveillance photographs of the robber wearing a dark pea jacket; Fernandez' post-arrest photograph; and Sweeney's testimony about the search and seizure. The only hearsay was the agent's statement that three confidential informants had told him that Fernandez was one of the robbers shown in the surveillance photographs and that two eyewitnesses had said the robber used a .45 automatic pistol. While we see no reason why the eyewitnesses' photographic identification should not have preceded the grand jury proceedings so that they could have been called as witnesses, the grand jury was not deceived and there is no reason to believe it would not have indicted if eyewitnesses had been called.

### III. *Impermissibly Suggestive Identification.*

Appellant also unsuccessfully sought before Judge Bruchhausen the suppression of testimony by the bank employees with respect to the identification of Fer-

nandez on the ground that the array of photographs shown to them after the indictment was impermissibly suggestive.[1] Sweeney presented six photographs, all of blacks in a manner that apparently was in no way exceptionable. Only one of the six was of an individual with an Afro haircut and with an extremely light skin, which the surveillance photographs showed the man wearing the dark pea jacket to be.

If this were all, it would be tolerably clear that the array was impermissibly suggestive, although other questions would remain. While the Government cannot be expected to produce photographs of persons identical with the accused except in minor details, here the surveillance photos showed a "black" with a skin almost that of a white; none of the five other photographs even approached this in lightness of color. Also, despite the Government's assertion that the robber's Afro was concealed by a cap, examination of the surveillance photographs shows enough hair protruding below the rear of the cap that an attentive observer would have little doubt the robber had an Afro haircut; the eyewitness descriptions notably made reference to this. The Government's photograph collection must be extensive enough that, particularly with the lack of time pressure here, it could have produced another picture of an individual more nearly approximating Fernandez in skin color and hairstyle.

A more nearly persuasive argument by the Government is this: On January 25, 1971, Agent Sweeney had exhibited to bank employees an array of five photographs, one (but only one) of which was of a black with light skin and an

---

1. It is not and could not successfully be here contended that the presentation of the photographs after indictment and without the presence of counsel was per se illegal. See United States v. Fitzpatrick, 437 F.2d 19, 25–26 (2 Cir. 1970); United States v. Mojica, 442 F.2d 920, 921 (2 Cir. 1971). See also United States v. Bennett, 409 F.2d 888, 898–900 (2 Cir. 1969), cert. denied sub nom. Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.

Ed.2d 101 (1970). However, prosecutors might well consider whether they would not only better protect the rights of the defendant but save themselves much needless argument if, in a case like this, where the defendant was in custody and there was no time pressure, they would have a properly conducted lineup. Compare Simmons v. United States, 390 U.S. 377, 386 n. 6, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

Afro haircut—notably, an individual mistakenly arrested for this crime. The employees did not identify this individual as one of the robbers. This, argues the Government, shows that the identification of Fernandez was not based on his haircut and skintone but on other characteristics.

■ We would readily accept the argument if all eleven photographs had been submitted for the first time on March 2; the light-skinned, Afro haircut individual whose photograph was included in the January 25 array was of a type sufficiently close to Fernandez that no impermissible suggestion could then be found. But here the fact remains that the March 2 array contained no photograph remotely resembling Fernandez in skin color and hair-do. Indeed, the very fact that the witnesses had once rejected a black with a light skin and an Afro might have subconsciously enhanced their willingness to accept one on the second go-around.[2]

■ The more doubtful question is whether the error in admitting the photographic identification testimony on the prosecution's direct case was prejudicial. The jury took the identification issue with appropriate seriousness, examined the surveillance photographs, and requested during the course of their deliberations that Fernandez walk slowly along the jury box demonstrating his left side. While it could very well be that the jury found Fernandez guilty solely on the basis of their own comparison of him with the surveillance photographs, as they could properly have done without any eyewitness testimony, and upon eye witnesses' in-court identification of defendant, which, as we indicate below, may properly be admitted again upon a retrial, we cannot say that under the circumstances of this case the testimony of Mrs. Kalata and Mr. Pesch concerning their photographic identification

on March 2, 1971, did not play a part in the result. We need not decide, however, whether the admission of this testimony alone would require reversal since the combined effect of the error in admitting the photographic identification testimony, in failing to give a cautionary instruction on the danger of misidentification and in requiring defense counsel to make her objections to the charge in the presence of the jury, the latter two discussed in Part IV, *infra*, calls for a new trial.

■ What has just been written nearly suffices to answer the question whether the photographic identification gave rise to such a "substantial likelihood of irreparable misidentification," Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), on the part of the four employees who made this—Mrs. Kalata, Mr. Pesch, Mr. O'Connor (the bank manager) and Mr. Benjamin—that they should be precluded from making an in-court identification at a new trial. *Cf.* United States ex rel. Phipps v. Follette, 428 F.2d 912 (2 Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970); United States v. Sutherland, 428 F.2d 1152, 1154–1156 (5 Cir. 1970). On this point, the employees' rejection of the earlier photographic array indeed has great force. The robbery took five to seven minutes during daylight hours, and there is enough in the record to show, without any further "taint" hearing, that the witnesses had excellent opportunity for observation and displayed no uncertainty about their initial identification. See United States ex rel. Geralds v. Deegan, 307 F.Supp. 56 (S.D.N.Y.1969). Thus, the record establishes that a subsequent in-court identification will not be tainted by the earlier photographic identification. United States v. Wade, 388 U.S. 218, 240, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); United States v. Sutherland, 428 F.2d 1152, 1156 (5

---

2. In light of our conclusion that the second array was impermissibly suggestive, we need not pass upon the argument that defense counsel's cross-examination of Agent Sweeney at the suppression hearing with respect to the circumstances of the identification was improperly curtailed.

Cir. 1970). It will be for defense counsel to elect whether or not to bring out the March 2 photographic identification [3] for impeachment.[4]

## IV. Requests to Charge with respect to Identification.

Conformably with F.R.Cr.P. 30, defense counsel submitted requests to charge on the issue of identification. Since the judge refused to allow them to be marked as an exhibit, we do not know exactly what they were although the objections to the charge afford a fair idea. He also declined counsel's request to be allowed to take exceptions to the charge out of the presence of the jury.

In the course of his charge, the judge stated, correctly enough so far as the instruction went:

> It is the duty of the United States Attorney in this case to prove the identification of this defendant beyond a reasonable doubt. . . .
>
> . . . If they fail to do so, then, of course, you would say that they failed to prove their case against him and he would be entitled to an acquittal on the question of identification.
>
> You determine the question of identification by the direct evidence and the circumstantial evidence that has been adduced before you. It is for you to determine from that evidence whether or not there is a proper identification of this defendant and whether or not this is the defendant that committed this crime as charged in the indictment.
>
> If you find that they have failed to prove that beyond a reasonable doubt pursuant to such rules of circumstantial evidence and direct evidence . . . .

Defense counsel objected to the court's failure to charge that misidentification can occur as a result of honest error. She also excepted—in various ways which were largely frustrated by trivial objections of the prosecutor and interruptions by the judge—to the court's failure to charge that errors in photographic identification can occur and that these may affect a subsequent in-court identification. The court declined to alter its charge.

■■ While a defendant is not entitled to a reading of all that was said about the dangers of misidentification in United States v. Wade, supra, 388 U. S. at 228–236, 87 S.Ct. at 1926 and Simmons v. United States, supra, 390 U.S.

3. Since Fernandez has apparently altered his facial hair, it would also be competent for the Government to introduce his post-arrest photograph, without any reference thereon to the bank employees' identification.

4. The record and the briefs contain much discussion over the fact that several bank employees had earlier said that the robber wearing the navy blue pea jacket was only some 5′6″ to 5′8″ in height, whereas, as shown by his post-arrest photograph, Fernandez is 6′ tall even without the added height of the Afro. In connection with this, defense counsel requested, but never succeeded in obtaining, material allegedly in the Government's files showing the dimensions of the interior of the bank so as to permit a calculation of the height of the man wearing the dark pea jacket in the surveillance photographs. This should be promptly furnished if available; if not, the Government should cooperate in enabling counsel to get this material from the bank.

There is also much debate about a list of some 30 persons who were in the bank at the time of the robbery, allegedly compiled by Manager O'Connor, and a list of the names of nine such people which Agent Sweeney made up, at the request of defense counsel, in the course of the first trial. The latter list was introduced as a defense exhibit, but could not be located at the second trial. We have expressed our concern at the careless way in which exhibits are often handled, see United States v. Silverman, 430 F.2d 106, 127 n. 2 (2 Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971). See also Second Circuit Local Rule § 11. Whatever the rights and wrongs of all this as regards the past, the Government should promptly furnish defense counsel with all information possessed by the bank or by federal agents as to the names and addresses of persons who were in the bank at the time of the robbery if counsel still desires this.

at 383–384, 88 S.Ct. at 967, we would think it reasonable that a properly drafted instruction, drawing particularly on Mr. Justice Harlan's language in *Simmons*, should be given if requested. Whether failure to do so would constitute reversible error would depend upon the circumstances. Here the judge not only declined to give such an instruction, but required counsel to make her objections in open court, with the consequent danger that the jury might infer that counsel's points were without merit. Yet F.R.Cr.P. 30, as amended in 1966, provides, as F.R.Civ.P. 51 has always done, that, on request of any party, opportunity shall be given to object to instructions out of the presence of the jury. The rule is so plain, and its purpose so obvious, that we can perceive no justification for ignoring it. Here we need not go so far as to hold, as was done in Hall v. United States, 378 F.2d 349 (10 Cir. 1967), that refusal to grant a request that objections to the charge be heard out of the presence of the jury calls for automatic reversal. However, enforcement of F.R.Cr.P. 30 demands a principle at least as severe as that which we have applied in civil cases. This is that such refusal will relieve a deprived party of the burden of showing that an objection to the charge pressed upon appeal has been sufficiently made below, and will demand reversal "if there is reasonable basis for concluding that the colloquy held in the presence of the jury as a result of the judge's ignoring or denying a proper request [to permit the objection to be made outside the jury's hearing] was prejudicial." Swain v. Boeing Airplane Co., 337 F.2d 940, 943

(2 Cir. 1964), cert. denied, 380 U.S. 951, 85 S.Ct. 1083, 19 L.Ed.2d 969 (1965).[5] The judge's refusal to give some instruction on the dangers of mistaken identification coupled with his unwarranted denial of counsel's request to be allowed to object outside the presence of the jury thus would tip the scale for reversing this judgment, even if we were satisfied that the error in admitting the photographic identification testimony was itself harmless error.[6]

Reversed for a new trial.

---

5. In saying this we do not put aside the possibility that the correct test in criminal cases may be that reversal will follow "unless it be demonstrable on an examination of the whole record that the denial of the right did not prejudice" a defendant's case. United States v. Schartner, 426 F.2d 470, 479–480 (3 Cir. 1970). The narrower principle of Swain suffices to demand reversal here.

6. The only other point made by appellant which merits mention in light of our dis-

position is the claim that if the Government had not failed to furnish Sweeney's grand jury testimony in response to counsel's demand under 18 U.S.C. § 3500 at the first trial, Fernandez might then have won an acquittal since, at that trial, Sweeney did not testify to Fernandez's admission that the gun was his. Apart from other considerations, Sweeney's grand jury testimony could not have helped Fernandez.