SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

PIG'N WHISTLE CORPORATION et al., Defendants.

No. 71 C 545.

United States District Court, N. D. Illinois, E. D.

March 29, 1973.

John I. Mayer, William Goldsberry, Joseph L. Grant, Mark A. Potter, Howard P. Alterman, Chicago, Ill., and Jeck Redden, San Francisco, Cal., for plaintiff.

Zlatnik, Gaines, Boyer & Shepp, Allan I. Boyer and Theodore G. Gaines, Mark S. Lieberman & Jeffrey Wohlstadter, Sloan & Bragiel, Alex H. Dolnick. Narcisse Brown, Chicago, Ill., for defendants.

Emanuel Fields, pro se.

## OPINION

BAUER, District Judge.

This cause comes on motion of plaintiff, Securities and Exchange Commission, for a judgment of permanent injunction in accordance with the Com-

plaint filed herewith as to the defendants, Alvin Dolnick and George Dixon, and the Court, having considered the Complaint and answers of the defendants and having heard evidence and read memoranda of law, submitted by counsel, makes findings of fact and conclusions of law as follows:

## FINDINGS OF FACT

1. Pig'N Whistle Corporation was incorporated in Delaware in 1926. From November, 1968 to the present its principal place of business has been in Elgin, Illinois, and Chicago, Illinois.

2. Congress-Pacific Corporation, a Nevada corporation dominated and controlled by Paul Pickle, a felon, acquired 180,181 shares (eighty percent) of the 224,878 shares of Pig'N Whistle common stock outstanding in November 1968 for 6¢ per share. Thereafter Pickle dominated and controlled Pig'N Whistle Corporation.

3. No registration statement as to the common stock or convertible debentures of Pig'N Whistle Corporation has ever been in effect with the Securities and Exchange Commission; a registration statement for 250,000 shares of Pig'N Whistle common stock was filed on December 24, 1969 but never became effective.

4. In November, 1968, Alvin Dolnick became a shareholder of King Kastle Systems, Inc., a Delaware corporation dominated and controlled by Paul Pickle.

5. King Kastle Systems, Inc., was merged into Pig'N Whistle Corporation in June, 1969 pursuant to a pre-existing plan to distribute to the public unregistered shares of Pig'N Whistle Corporation.

6. In November, 1968 George Dixon agreed to sell the Holiday Lodge to Pig'N Whistle Corporation for Pig'N Whistle stock.

7. From November 1968 to December 1969, Pig'N Whistle Corporation issued, sold and distributed, directly and indirectly, approximately 2,000,000 shares of common stock and 599 convertible debentures to the public.

8. From November, 1968 to June, 1970, defendants Alvin Dolnick and George Dixon singly and in concert with others, in the Northern District of Illinois, Eastern Division, and elsewhere, were, directly and indirectly, participating in the distribution of unregistered Pig'N Whistle securities by:

a) making use of the means and instruments of transportation and communication in interstate commerce and of the mails, to sell securities, namely, common stock and convertible debentures of Pig'N Whistle Corporation, through the use and medium of prospectuses and otherwise;

b) carrying and causing to be carried through the mails and in interstate commerce, by means and instruments of transportation, the common stock and convertible debentures of Pig'N Whistle Corporation.

9. From May, 1969 to January, 1970, Alvin Dolnick pledged with banks shares of Pig'N Whistle stock.

10. Alvin Dolnick and George Dixon knew that the shares referred to in paragraphs 8 and 9 hereof were neither registered nor exempt from registration.

11. From November, 1968 to June, 1970, the defendants George Dixon and Alvin Dolnick, in the offer and sale of securities, namely, common stock and convertible debentures of Pig'N Whistle Corporation, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, were, directly and indirectly:

a) employing devices, schemes, and artifices to defraud;

b) obtaining money and property by means of untrue statements of material facts and omissions to state material facts necessary, in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c) engaging in transactions, practices and a course of business which operates

and would operate as a fraud and deceit upon the purchaser of such securities; all more fully explained in paragraphs 12 and 13 below.

12. The defendant Alvin Dolnick made untrue statements of material facts and omitted to state material facts concerning, *inter alia*, the following:

a) the lack of registration of Pig'N Whistle common stock and convertible debentures;

b) the non-marketability of said securities;

c) Paul Pickle who dominated and controlled Pig'N Whistle Corporation;

d) the operating losses and deficit net worth of Pig'N Whistle Corporation;

e) the price for the proposed registered offering of Pig'N Whistle common stock;

f) the details concerning the King Kastle buy-back letter.

13. The defendant George Dixon made untrue statements of material facts and omitted to state material facts concerning, *inter alia*:

a) the market value of Pig'N Whistle common stock prior to November, 1968;

b) the number of shares issued to himself and Paul Richards in the Holiday Lodge acquisition;

c) the lack of registration of Pig'N Whistle securities;

d) the non-marketability of said securities;

e) the acquisitions of Pig'N Whistle which had been owned in part by management.

14. From November, 1968 to June, 1970, the defendants George Dixon and Alvin Dolnick, by the use of means and instruments of interstate commerce and of the mails, in the Northern District of Illinois, Eastern Division, and elsewhere, were, directly and indirectly, in connection with the sale of securities, namely common stock and convertible debentures of Pig'N Whistle Corporation:

a) employing devices, schemes, and artifices to defraud;

b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c) engaging in acts, practices and a course of business which operates and would operate as a fraud and deceit upon any person;

all more fully explained in paragraphs 12 and 13 above.

## CONCLUSIONS OF LAW

From the foregoing facts, the Court adopts the following conclusions of law:

1. This Court has jurisdiction of this action under Section 22(a) of the Securities Act of 1933, as amended (15 U.S.C. § 77u(a)) and Section 27 of the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78aa) and it has jurisdiction of the parties.

2. A pledge of securities for value is a sale as defined in Section 2(3) of the Securities Act of 1933, as amended (15 U.S.C. § 77b(3)).

3. Each of the defendants is an underwriter as defined in Section 2(11) of the Securities Act of 1933, as amended (15 U.S.C. § 77b(11)).

4. The defendants have violated Sections 5(a) and (c) of the Securities Act of 1933 (15 U.S.C. § 77e(a), (c)).

5. The defendants have violated Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a)) and Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 promulgated thereunder (17 C.F.R. 240.10b–5).

6. A final judgment of permanent injunction should be granted in accordance with plaintiff's motion.

## JUDGMENT ORDER

This cause comes on the motion of plaintiff, Securities and Exchange Commission, for a final judgment of permanent injunction against the defendants

Alvin Dolnick, George Dixon, and the Court, having considered the complaint, and memoranda of law, and having heard the evidence and having made findings of fact and conclusions of law:

It is therefore ordered, adjudged and decreed:

That the defendants Alvin Dolnick and George Dixon, their agents, servants, attorneys, employees, and each of them, be and hereby is restrained and permanently enjoined from, directly or indirectly:

1. Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell common stock or convertible debentures of Pig'N Whistle Corporation or any other security of any issuer, or carrying such securities or causing them to be carried through the mails or in interstate commerce by any means or instruments of transportation, for the purpose of sale or for delivery after sale, unless and until a registration statement is in effect with the Commission as to such securities;

2. Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities through the use or medium or a prospectus, or otherwise, unless and until a registration statement has been filed with the Commission as to such securities, or while a registration statement as to such securities is the subject of a refusal order or stop order issued by the Commission or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act of 1933, as amended (15 U.S.C. § 77h);

3. Carrying or causing to be carried through the mails or in interstate commerce, for the purpose of sale or for delivery after sale, the common stock of Pig'N Whistle Corporation, or any other security of any issuer, for which a registration statement has been filed, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of Section 10 of the Securities Act of 1933; provided that the foregoing paragraphs 1, 2, and 3 shall not apply to any securities or transactions which are exempt from the provisions of Section 5 of the Securities Act of 1933 (15 U.S.C. § 77e);

4. In the offer or sale of the common stock or convertible debentures of Pig'N Whistle Corporation, or any other security of any other issuer, by use of the mails or any means or instruments of transportation or communication in interstate commerce, employing devices, schemes, or artifices to defraud or engaging in any act or practice, or course of business which would operate as a fraud or deceit upon purchasers, or obtaining money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

5. In connection with the purchase or sale of the common stock or convertible debentures of Pig'N Whistle Corporation, or any other security of any issuer, by use of the means and instruments of interstate commerce or of the mails, employing any device, scheme or artifice to defraud, engaging in acts, practices or a course of business which would operate as a fraud or deceit upon any person, making any untrue statements of material facts or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.