**UNITED STATES of America,
Appellee,**

v.

**Phillip J. GENTILE and Hunter B. Brashier, Defendants-Appellants.**

**Nos. 497, 499, Dockets 75–1283, 75–1300.**

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1975.

Decided Feb. 10, 1976.

Certiorari Denied June 14, 1976.
See 96 S.Ct. 2651.

---

W. Cullen MacDonald, Asst. U. S. Atty., New York City (Thomas J. Cahill, U. S. Atty. for the Southern District of New York, and John C. Sabetta, Asst. U. S. Atty., New York City, on the brief), for appellee.

John J. Tigue, Jr., New York City (Kostelanetz, Ritholz & Mulderig and Lawrence S. Feld, New York City, on the brief), for defendant-appellant Phillip J. Gentile.

Howard L. Jacobs, New York City, for defendant-appellant Hunter B. Brashier.

Before LUMBARD, FRIENDLY and MULLIGAN, Circuit Judges.

LUMBARD, Circuit Judge:

Phillip J. Gentile and Hunter B. Brashier appeal from their convictions, after a jury trial in the Southern District, for participation in a conspiracy to sell, pledge, and distribute unauthorized and fraudulently issued securities in violation of 15 U.S.C. §§ 77q(a), 77x and 18 U.S.C. §§ 1341, 2314. Gentile was also convicted on five other counts which charged fraud in the distribution of the securities.[1] Appellants urge reversal of their convictions on numerous claims which suggest that error pervaded each stage of their prosecution from the indictment to the district judge's charge to the jury. We find no error and accordingly affirm the convictions.

The conspiracy involved an intricate scheme by which blank stock certificates

---

1. Gentile received a sentence of thirty-six months' imprisonment, all but four months of which was suspended, and fines totaling $5,000. Brashier received a suspended sentence and a three-year probationary term.

were wrongfully and improperly completed and disposed of between 1970 and 1973 by Leonard Reisch, the president of Fidelity Registrar and Transfer Co., to whose care the certificates of various companies had been entrusted. Reisch issued several of the unauthorized certificates in his own name and either sold them on the over-the-counter market or pledged them to banks as collateral for loans. Other loans were obtained by co-conspirators, including Gentile, through the hypothecation of wrongfully completed certificates issued in their names.[2] The proceeds of these loans were divided among one or more of the co-conspirators and Reisch. Reisch also completed stock certificates in Gentile's name that were apparently sold by Gentile through brokerage accounts.

In September 1973 the plan for distribution was altered after agents of the Securities and Exchange Commission searched the offices of Fidelity in New Jersey and seized shareholder ledgers and other implements of the scheme. Gentile and a co-conspirator, Manuel Posy, determined that the safest course to follow would be to distribute their remaining securities on the West Coast and abroad. Throughout the latter months of 1973, Gentile conferred with other members of the conspiracy concerning the best means of disposing of the securities. In December of that year appellant Brashier arranged a meeting in California between Gentile and Rochlin, a stockbroker with the Beverly Hills office of Merrill Lynch, Pierce, Fenner & Smith, who had offered, at Brashier's request, to sell some stock that Gentile had pledged as collateral for a bank loan. Approximately one month after these sales were completed Gentile was informed by Rochlin that the securities were not transferable. Although he had promised to do so, Gentile never provided documents confirming his purchase of all but one of the securities.

Brashier also introduced Gentile to Carl Hermanson, an employee of Brashi-

er's firm on the West Coast Commodities Option Exchange, who had expressed a willingness to facilitate the sale of over-the-counter securities for Gentile through a third party's account. Hermanson found a willing conduit, Howell, who would sell the securities through his parents' account at Shields & Co., and Hermanson delivered to Howell unauthorized certificates issued in Posy's name and a letter, purportedly signed by Posy, sanctioning the sale. When Shields & Co. requested an additional notarized authorization, a person purporting to be Posy brought such a letter to Juanita Amoroso, a notary public in California who had previously notarized a similar form authorizing sale of stock in Posy's name. Upon receipt of this authorization, the brokerage house accepted the sales order. About a month later, these certificates were also discovered to be defective. When confronted by the party who had sold the stock, Brashier denied having any knowledge of its defective nature and denied even knowing who Hermanson was.

In October 1974, when Brashier was interviewed by an Assistant United States Attorney and an agent of the Securities and Exchange Commission, he made numerous false exculpatory statements concerning his relations with the parties in the two transactions with Rochlin and Hermanson.

Neither Gentile nor Brashier testified at trial. Brashier's only witness, his fiancee, testified as to his activities during December and January. Gentile introduced evidence to show that he was in Fresno, California, at the time when he had allegedly appeared before Amoroso in Los Angeles.

### I. Sufficiency of the Evidence as to Brashier.

■ Appellant Brashier contends that the evidence against him was insufficient to allow the jury to conclude that he was guilty beyond a reasonable doubt. See *United States v. Frank,* 494 F.2d

---

2. Of the other indicted co-conspirators, four entered pleas of guilty to one or more counts and one was found guilty after trial but has not entered an appeal.

145, 153 (2d Cir.), cert. denied, 419 U.S. 828, 95 S.Ct. 48, 42 L.Ed.2d 52 (1974); *United States v. Taylor,* 464 F.2d 240 (2d Cir. 1972). We disagree. There was ample evidence from which the jury could properly have found beyond a reasonable doubt that Brashier was a knowing and willing member of the conspiracy. Brashier's conduct consistently demonstrated a desire furtively to shield himself from view as a participant in the liquidation of the certificates held by Gentile. Thus, Brashier requested Hermanson to find a third party who would be willing to sell some of the stock as nominee rather than simply contacting a securities broker himself, despite Brashier's familiarity with the securities field.[3] He further insisted that Hermanson deliver the proceeds of the stock sale—a total of $8900—to him in cash, although Hermanson had received a check from the nominee-seller. Finally, the series of false exculpatory statements made by Brashier during his interview with government officials evidenced a desire to disassociate himself from the transactions and thus showed consciousness of guilt. See *United States v. Jacobs,* 475 F.2d 270, 279, 281 (2d Cir.), cert. denied sub nom. *United States v. Lavelle,* 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973).

II. Single or Multiple Conspiracy.

Brashier also claims that he was not a member of the conspiracy charged in the indictment. He contends that the evidence demonstrated that the individuals who had conspired to sell and pledge unauthorized securities terminated their plan shortly after S.E.C. agents searched Fidelity's offices and found instrumentalities of the conspiracy. Since he was not involved in any dealings with the conspirators at this point—shortly after September 21, 1973—Brashier argues that his later assistance to Gentile could not make him a member of the conspiracy.[4] We disagree.

There was abundant evidence from which the jury could have found that the conspiracy began in 1970 and continued through the latter part of 1973 when Brashier assisted Gentile in disposing of certificates. That there was a variance in the places and means of disposition and some of those participating did not necessarily create a different conspiracy. Brashier's ignorance of the identity or scope of activities of other conspirators would not exonerate him from inclusion in the conspiracy charged in the indictment. See *United States v. Wyler,* 487 F.2d 170 (2d Cir. 1973). "Despite the existence of multiple groups within an alleged conspiracy, we have considered them as part of one integrated loose-knit combination in instances where there existed . . . a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *United States v. Bertolotti,* 529 F.2d 149, 154 (2d Cir. 1975). In this instance, where Brashier was familiar with transactions in securities and must have known the difficulties in obtaining bogus stock, he could not have failed to know that Gentile, who was not in the business of marketing stocks, could not have come into possession of these securities without the aid of others. Furthermore, the jury was properly

**3.** There was evidence that Brashier had previously managed a hedge fund, had repeatedly purchased and sold securities on his own behalf through other nominee accounts at several different brokers, and had operated a "financial services business" which assisted in the mailing of a prospectus concerning a new issue of stock by a company controlled by Gentile.

**4.** The government responds that "(b)y its verdict, the jury . . . rejected Brashier's contention that his acts constituted a separate conspiracy from the one charged in the indictment . . ." Government Brief at 13. This reply is unsatisfactory, however, for the very gravamen of Brashier's complaint is that the variance between the single conspiracy charged and the multiple conspiracies that were proven unduly prejudiced the jury against him. See *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Nevertheless, we find that there was sufficient evidence to support the government's theory of a single conspiracy.

instructed that it must find that defendants were members of the conspiracy charged in the indictment and that Brashier had joined the conspiracy.

Brashier relies primarily upon the testimony of his co-defendant Posy to support his argument that the conspiracy charged in the indictment terminated long before Brashier's involvement with the sale of Gentile's securities. He maintains that Posy left the country shortly after September 21, met Gentile in Israel in November and at that time they agreed to abandon their efforts at distribution. Posy later returned to the United States to give Gentile the stock that was ultimately sold, presumably without Posy's knowledge or consent, through Shields & Co. Posy then left the country a second time.

█ Posy's testimony, however, was more equivocal. His recognition that the scheme had been discovered led him to agree with Gentile in Israel that it would be disastrous to dispose of additional stock "at this time." Posy's willingness to surrender to the authorities and thereby terminate his role in the conspiracy was similarly ambiguous. In response to questions from Gentile's attorney, Posy testified that he returned the stock he held to Gentile "to hold the stock until such time that it could be given back to Mr. Reisch *or* turned over to the authorities." (emphasis added). Posy further testified that he returned to the United States not "to come clean," as suggested by Gentile's attorney, but "to wait and see what was going to happen." Thus it is clear that there was evidence to sustain the government's contention that the conspiracy had not terminated. See *United States v. Cirillo,* 468 F.2d 1233, 1239 (2d Cir. 1972), cert. denied, 410 U.S. 989, 93

S.Ct. 1501, 36 L.Ed.2d 188 (1973); *United States v. Cantone,* 426 F.2d 902 (2d Cir.), cert. denied, 400 U.S. 827, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970). The continuing distribution of the securities was well within the scope of the initial undertaking and thus Brashier's participation in that segment of the conspiracy inculpates him as a member of the conspiracy. See *United States v. Salazar,* 485 F.2d 1272, 1276 (2d Cir. 1973), cert. denied, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974).

### III. The Pledge of Securities as a Sale.

Gentile argues that the pledge of securities to a bank does not constitute an offer or sale within the meaning of the Securities Act of 1933, § 17(a), 15 U.S.C. § 77q(a),[5] and that therefore he was improperly convicted on those counts of the indictment that charged he violated the securities laws by pledging fraudulently issued securities. We find support contrary to this proposition in the wording, purpose, and judicial construction of the statute and therefore reject Gentile's argument.

█ The term "sale" is defined in the Securities Act of 1933, § 2(3), 15 U.S.C. § 77b(3) to include "every contract of sale or disposition of a security or interest in a security, for value." There is no requirement that title pass to constitute a "sale" within the meaning of the statute. Indeed, to read "sale" so restrictively would render superfluous the latter two disjunctive phrases in the statutory definition. Since Gentile obviously obtained value in the form of bank loans for his pledge of stock, his actions fall within the strict construction that we apply to criminal statutes. See *United States v. Del Toro,* 513 F.2d 656 (2d Cir. 1975).

---

**5.** That section provides:

> It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communications in interstate commerce or by the use of the mails, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud, or

> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

This result is implicit in our decision in *S.E.C. v. Guild Films Co.,* 279 F.2d 485 (2d Cir.), cert. denied sub nom. *Santa Monica Bank v. S.E.C.,* 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960). In that case, we denied a claim by pledgee banks that they did not "purchase" stocks pledged as collateral for loans, the proceeds of which were used to obtain many of the shares put up as collateral, and thus they were not exempt from the registration requirements of the Securities Act. We held that the term "purchase" under the Securities Act of 1933, § 2(11), 15 U.S.C. § 77b(11), was to be read in a manner complementary to the term "sale," and thus implied that a pledge was a "disposition of . . . a security or interest in a security, for value" that had been "sold" to the "purchaser" banks. Other courts that have considered the specific question before us have reached the same conclusion. See *S.E.C. v. Dolnick,* 501 F.2d 1279 (7th Cir. 1974); *S.E.C. v. Pig'N Whistle Corp.,* 359 F.Supp. 219 (N.D.Ill.1973); *S.E.C. v. National Bankers Life Ins. Co.,* 334 F.Supp. 444 (N.D.Tex.1971), aff'd 477 F.2d 920 (5th Cir. 1973). See also L. Loss, 1 Securities Regulation 649 (2d ed. 1961). To the extent that *McClure v. First National Bank of Lubbock, Texas,* 497 F.2d 490 (5th Cir. 1974), cert. denied, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975), suggests a contrary conclusion, we disagree with it.[6]

While it was noted in the *Guild Films* case that the Securities Act of 1933 was primarily intended to protect investors, 279 F.2d at 489, there is no reason to doubt that Congress intended that Act to protect defrauded lenders just as much as defrauded buyers. The pledgee takes a legally enforceable interest in the pledged securities which he assumes will compensate for any default on the underlying loan. The pledgee thereby decreases the risk that he will suffer loss due to nonpayment of the loan. In effect, the pledgee assumes a very real investment risk that the pledged securities will have continuing value, a risk that is identical in nature to the risk taken by investors which serves as the indisputable basis for statutory regulation of securities transactions. We therefore find no reason to treat the equivalent risks differently under the statute.

## IV. The Identification of Gentile by Amoroso.

During the trial, the government called Juanita Amoroso as a witness to testify that a party purporting to be Manuel Posy had requested her to notarize the letters authorizing the sale of the stock that was routed through Shields & Co. Amoroso was apparently not scheduled to make any in-court identification of Gentile as the person who had appeared before her some 17 months prior to trial. In fact, she had been unable to pick Gentile's picture out of a photographic display shown to her by the Assistant United States Attorney one week before trial.

While waiting to testify, Amoroso was seated on a bench outside the courtroom. During a recess, Gentile and six to ten other men left the courtroom and entered the hallway in which Amoroso was seated and Gentile then introduced himself to another individual. Amoroso claimed that at this point she recognized Gentile as someone she had previously met. She did not immediately associate him with the person for whom she had notarized the documents. She later tes-

---

6. *McClure* was a 10b–5 case in which stock was pledged in consideration for the bank's renewal of a loan to a corporation, the proceeds of which had been converted from the corporation's use. McClure argued that her pledge of stock, which became worthless when the bank foreclosed on the corporation's property, was a "sale" protected by the anti-fraud provisions of the Securities Exchange Act. The Fifth Circuit found that "a pledge of securities can constitute a 'sale' in some cases," but that "mere acceptance of a stock pledge as collateral in a privately negotiated transaction between borrower and lender does not, of itself, bring within the scope of the federal securities acts a transaction otherwise outside their purview." 497 F.2d at 495. The court suggested that the initial pledge would have been a "sale" if the bank had foreclosed on the stock. 497 F.2d at 496. We see no reason to make the character of the initial pledge dependent upon subsequent events.

tified that she had not heard Gentile in-troduce himself to any other party.

The Assistant United States Attorney informed Gentile's attorney that Amoroso had recognized Gentile and would make an in-court identification. The trial judge heard a motion to suppress in his chambers, and, after examining Amoroso, he found that the circumstances surrounding the out-of-court identification were not so suggestive and that Amoroso's identification was not so uncertain [7] that her testimony should be excluded.

While the attorneys were arguing the suppression motion in the judge's chambers, Gentile spoke to Amoroso and, in an apparent attempt to shake her testimony, advised her that he had proof of his whereabouts on the day in question. The conversation, however, had the opposite effect; Amoroso stated that hearing Gentile's voice reaffirmed her belief that he might have been Posy's impersonator.

Amoroso's testimony before the jury reflected her previous uncertainty. She admitted that she could not be sure that Gentile was the impersonator and that she might have seen him on other occasions.

▮▮▮ Gentile now argues that Amoroso's in-court identification should have been suppressed because the out-of-court identification was made outside the presence of defense counsel and in unnecessarily suggestive circumstances. We find no error in the admission of the identification. There is no claim that the out-of-court confrontation was in any way anticipated or arranged by the government. Therefore the dangers of improper influence that prompted the requirement in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) that counsel be notified of an impending identification procedure were not present here. Nor is there any merit in the claim that Amoroso's out-of-court identification was made in circumstances which impermissibly suggested that Gen-

tile was a defendant in the trial or was the person whom Amoroso had previously met. Compare *Brathwaite v. Manson*, 527 F.2d 363 (2d Cir. 1975), appeal docketed 44 U.S.L.W. 3379 (U.S. Jan. 6, 1976); *United States v. Roth*, 430 F.2d 1137 (2d Cir. 1970), cert. denied, 400 U.S. 1021, 91 S.Ct. 583, 27 L.Ed.2d 633 (1971). Gentile appeared in the hallway in the company of several other men. He was identified by his general features, or—in Amoroso's words—by his "smile and facial expression" rather than by a distinctive piece of clothing or by his appearance in isolation from other individuals. Compare *Brathwaite v. Manson,* supra. The fact that Amoroso recognized Gentile's voice during his conversation with her cannot be held to be an element of an unnecessarily suggestive identification procedure because it was Gentile who initiated the contact. Compare *Neil v. Biggers*, 409 U.S. 188, 195 & n.4, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Furthermore, there has been no challenge to the propriety or effect of the photographic display that Amoroso attended prior to trial and we find no improper suggestiveness in that procedure that would taint the in-court identification. Amoroso had confronted the person purporting to be Posy on two occasions some 17 months before the in-court identification. On the first occasion she spent several moments with this individual while attempting to verify his identity. His image obviously did not escape her immediately, for when he visited her office the second time, she called him by his assumed name before he even approached her. Given these facts we find that the trial judge had a basis for finding that Amoroso's testimony, although equivocal, was both competent and admissible. Moreover, as we have indicated above, there was no showing that the in-court identification was the result of an impermissibly suggestive confrontation. Compare *United States ex rel. Phipps v. Follette*, 428 F.2d 912 (2d Cir.), cert. denied, 400 U.S. 908, 91 S.Ct. 151,

---

7. The trial judge determined that Amoroso's uncertainty was relevant to her credibility rather than to her competency to testify.

27 L.Ed.2d 146 (1970); *United States ex rel. Gonzalez v. Zelker,* 477 F.2d 797, 801–05 (2d Cir.), cert. denied, 414 U.S. 924, 94 S.Ct. 254, 38 L.Ed.2d 158 (1973). It was proper to leave to the jury the determination of the weight that the evidence merited. See *United States v. Gerry,* 515 F.2d 130 (2d Cir.), cert. denied, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *Tripp v. United States,* 381 F.2d 320 (9th Cir. 1967).

■ While it is obviously preferable to seclude witnesses such as Amoroso until they are called to the stand, all witnesses who testified prior to Amoroso had also been seated outside the courtroom and Gentile had not objected to this procedure.

■ Although the trial judge had previously indicated that he would give a cautionary instruction regarding the precarious nature of eyewitness identification, his failure to do so does not constitute reversible error. While we have emphasized the desirability of giving a properly drafted cautionary instruction on the fallibility of eyewitness identification when requested, see *United States v. Evans,* 484 F.2d 1178 (2d Cir. 1973); *United States v. Fernandez,* 456 F.2d 638 (2d Cir. 1972), we have never held that failure to give such an instruction always constitutes "plain error" requiring automatic reversal. In this instance, Amoroso's testimony was so equivocal as to make its fallibility self-evident, and counsel did not call the judge's attention to the omission. The trial judge did give a clear and thorough charge to the jury concerning the credibility of witnesses which implicitly cautioned the jury about eyewitness identifications based on brief and distant encounters. See *United States v. Evans, supra.*

■ In any event, any error in the admission of Amoroso's testimony was harmless. See *United States v. Madison,* 458 F.2d 974 (2d Cir.), cert. denied, 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972); Fed.R.Crim.P. 52(a). Five other witnesses provided eyewitness testimony that linked Gentile to the Shields & Co. transaction that was the subject of Amoroso's examination. Seven other witnesses connected Gentile to other fraudulent pledges and sales that were the subject of the prosecution.

### V. The Charge.

Gentile argues that the district judge's charge to the jury on the need to find that a defendant had knowledge of the unlawful purpose of the conspiracy in order to convict the defendant on the conspiracy charge was fatally imbalanced because it did not contain a statement that if the jury nevertheless found that the defendant actually believed that the securities involved in the scheme were not fraudulently issued, they should acquit him. The judge charged:

> In determining whether a defendant acted knowingly and willfully you may consider whether the defendant deliberately closed his eyes to what otherwise would have been obvious to him, and that is a consideration of some significance in this case.

Our concern in the cases in which we have discussed the need for a balanced charge has been that the language of the charge, by implying that something less than knowledge will be sufficient to convict, may effectively lower the government's burden of persuasion. See *United States v. Brawer,* 482 F.2d 117 (2d Cir. 1973); *United States v. Jacobs,* 475 F.2d 270 (2d Cir.), cert. denied, sub nom. *Lavelle v. United States,* 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973).

Reading the charge to the jury as a whole, as we must, *United States v. Bright,* 517 F.2d 584, 588 (2d Cir. 1975), we find that the trial judge advised the jury at some length as to the proper standard to be applied to the question of knowledge for all crimes charged in the indictment.

Although the trial judge gave no specific language in his charge on knowing participation in the conspiracy, he drew special attention to the conspiracy count of the indictment while including it in his general discussion of knowledge with respect to the substantive counts. This discussion contained a thorough and balanced instruction with respect to what

the government was required to prove regarding each defendant's state of mind in order to secure a conviction. The relevant sections of the charge will suffice to demonstrate its adequacy:

> I am now about to define for (sic), ladies and gentlemen, the words "knowingly" and "willfully," and should I not have defined them earlier—I don't think I did with respect to conspiracy—they apply to every crime charged here.
>
> The word "knowingly" means to act purposely and deliberately. The term "willfully" means to act intentionally or with a bad purpose and to do something that the law forbids.
>
> In other words, to convict a defendant on any count, you must find that the defendant purposely did the acts with which he is charged and did not act carelessly or negligently or through inadvertent error or mistake or something of that nature.
>
> \* \* \* \* \* \*
>
> However misleading or deceptive a plan may be, its execution does not constitute a crime if the plan was devised in good faith.
>
> \* \* \* \* \* \*
>
> Honesty and good faith on the part of a defendant is always a defense to the charge in these counts or any counts. An honest belief in the truth of the representations made by a defendant is a defense, however inaccurate the statements may turn out to be.

The charge adequately advised the jury that each defendant had to have actual knowledge that he was participating in a crime before he could be convicted of that crime. Our conclusion is supported by the fact that the trial judge scrupulously avoided use of the technical and confusing phrase "reckless disregard," which caused both judge and jury difficulty in *United States v. Bright,* supra. While no particular word or words determine the adequacy of the charge, here the instruction relating to knowledge was given in terms of the more concrete expression "deliberate disregard," which implies that knowledge could be inferred if the jury found that the defendant was aware of the risk that his conduct was illegal but proceeded nonetheless.

Affirmed.