**UNITED STATES of America, Appellee,**

v.

**Frederick J. MONTELBANO, Appellant.**

**No. 703, Docket 77–1382.**

United States Court of Appeals, Second Circuit.

Argued Feb. 28, 1978.

Decided April 9, 1979.

Jonathan J. Silbermann, New York City (Martin Erdmann, Federal Defender Services Unit, The Legal Aid Society, New York City, on the brief), for appellant.

John S. Siffert, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty.,

9. See note 8 *supra.*

and Richard Weinberg, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before LUMBARD, FEINBERG and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

On this appeal from a judgment entered after a four day jury trial in the Southern District of New York, Thomas P. Griesa, *District Judge,* convicting appellant of violating certain provisions of federal law stemming from his participation in the hijacking of a truckload of seafood,[1] the principal issue is whether the district court erred in declining to give a requested cautionary instruction concerning the reliability of eyewitness identification testimony. We hold that the district court did not err in declining to give the instruction in the instant case. We affirm the conviction.

### I.

The events which culminated in the hijacking began during the early morning hours of December 6, 1976. At 5 A.M., the O.K. Trucking Company dispatched one of its drivers, Ralph Eme, age 19, in a refrigerated truck from Philadelphia to pick up frozen seafood from two refrigerated warehouses in Jersey City and from one in New York City. Eme did so.

After loading his truck with substantial amounts of seafood[2] at the three warehouses, Eme was directed to proceed to a fourth warehouse in Manhattan to assist other O.K. Trucking drivers by taking on overflow from their trucks before Eme returned to Philadelphia. It was while Eme was en route to the fourth warehouse in Manhattan that the hijacking occurred.

At about 10:30 A.M., while driving south on Tenth Avenue, Eme stopped for a red light at the intersection of Tenth Avenue and 14th Street. A man forced his way into the driver's side of the truck and shoved Eme over to the passenger's side. This unidentified hijacker (referred to as "Doe" in the indictment and at trial) drove the truck around the corner and stopped on 14th Street. Doe ordered Eme to climb over to the driver's side and to drive the truck south on West Street until he came to the waterfront where he was ordered to stop. Eme did so.

The truck was being followed by a red Rambler. When the truck stopped at the waterfront, the Rambler did also. A man Eme later identified as Montelbano and another unknown man (referred to as "Roe") got out of the Rambler and walked to the passenger's side of the truck. Montelbano instructed Doe, who was seated on the passenger's side of the truck, to tell Eme to do as he was told or his brains would be blown out. Eme heard what was said. Montelbano returned to the Rambler. Doe, who remained on the passenger's side, directed Eme to drive to the Fulton Fish Market. He did so. The truck and the Rambler both stopped at the Fulton Fish Market.

Montelbano got out of the Rambler at the Fulton Fish Market. He forced his way into the driver's side of the truck, shoving Eme from the driver's side toward the passenger's side and sandwiching him between Montelbano and Doe. Montelbano drove the truck from the Fulton Fish Market, out of Manhattan, and onto the Long Island Expressway. Roe followed in the Rambler.

During this trip Montelbano told Eme to take off his glasses, to look straight ahead, and to follow instructions or his brains would be blown out. Eventually Montelbano left the Expressway, stopped at a gas station, and made a phone call. Upon returning to the truck, Montelbano drove for another fifteen to twenty minutes before stopping in the Babylon area of Long Is-

---

1. Montelbano was convicted of conspiring to steal goods from interstate commerce, 18 U.S.C. §§ 659 and 371 (1976) (Count One); of obstructing interstate commerce by the use of threats in violation of the Hobbs Act, and conspiring to do so, 18 U.S.C. §§ 1951 and 371 (1976) (Count Two); and of stealing goods from interstate commerce, 18 U.S.C. § 659 (1976) (Count Three).

2. The truckload of seafood consisted of 11,000 pounds of lobster tails, shrimp and crab meat valued in excess of $32,000 wholesale.

land. There the Rambler also stopped. Montelbano got out, walked behind the truck, and spoke with Roe who had gotten out of the Rambler. Montelbano then returned to the truck and drove it into a shopping center.

At the shopping center, Montelbano ordered Eme out of the truck and into the Rambler where he remained with Doe. Montelbano, accompanied by Roe, then drove the truck away to dispose of the cargo of seafood. They returned forty minutes later with the empty truck.

Montelbano then drove the truck to another shopping center, followed by the Rambler which was driven by Roe. On this trip Eme was forced by Roe to lie face down on the back seat of the Rambler.

At this second shopping center, Montelbano abandoned the empty truck. He took over the driver's seat of the Rambler and, accompanied by Doe, Roe and Eme, drove around that area of Long Island for a short while. Roe took Eme's driver's license from him and warned him that, if any of the men were caught, someone would come to his address and get him.

Eventually Montelbano released Eme and instructed him to walk straight away from the car without turning back. Shortly before 3:30 P.M., Eme called the police from a gas station near the Long Island Expressway and reported the hijacking. Five hours had elapsed since the truck was first seized in Manhattan. The cargo of seafood never was recovered. The empty truck was abandoned at the second of the two shopping centers to which it had been driven.

## II.

In due course Montelbano was arrested. An indictment was returned on March 15, 1977 charging him with the offenses stated above. See note 1 *supra*. At his trial which began August 1, 1977, the government called nine witnesses and introduced twenty-four exhibits. The government's case consisted of eyewitness identification of Montelbano, circumstantial evidence, false exculpatory evidence, and prior similar act evidence.

Eme's eyewitness identification of Montelbano was based on his close, unobstructed view of defendant at frequent intervals during the five hour period of the hijacking. Nine days after the hijacking Eme picked Montelbano out of a lineup at FBI headquarters. Eme said Montelbano "looked similar", but added that he was not certain that he was the participant in the hijacking. Eme also identified Montelbano at trial, stating, "I believe it is the man sitting at the table." On cross-examination, defense counsel asked Eme if he meant, when he viewed the lineup, that Montelbano "could have been" one of the men involved in the hijacking. Eme replied that "at the time of the lineup, I believed Mr. Montelbano was the man . . . ." Both eyewitness identifications were admitted in evidence.

The government's circumstantial evidence related chiefly to Montelbano's access to the red Rambler and its whereabouts on December 7, the day of the hijacking. Agnes Pollack, Montelbano's girlfriend with whom he was living, testified at the trial that the 1969 Rambler belonged to her, that Montelbano had ready access to it, that he used it whenever he pleased, and that he had used it on the day of the hijacking. Montelbano testified before the grand jury that he had used the Rambler on the day of the hijacking.

Although Montelbano did not testify at the trial, he did give false exculpatory testimony before the grand jury that he had used the Rambler to get to work at the Fulton Fish Market on the morning of December 7; that at about 1 P.M. that day he had driven the Rambler to a bar in the vicinity of Tenth Avenue and 14th Street where he remained for a half hour; and that on the same day he had driven the Rambler to his ailing mother's home in Brooklyn where he visited her from 2 P.M. until dinner time. Montelbano's father testified at the trial that he and his wife (Montelbano's mother) had been away from their home on December 7 from 10 A.M. to 4 P.M., and that they had not seen Montelbano during that time. Before the grand

jury, moreover, Montelbano was unable to identify any person he had met at the Fulton Fish Market that morning; nor was he able to identify the bar he had visited in the vicinity of Tenth Avenue and 14th Street.

The government also adduced prior similar act evidence that on September 29, 1976 —less than three months before the December 7 hijacking—Montelbano had been caught burglarizing seafood from Fiore Brothers in Nassau County. State charges arising from the Fiore Brothers burglary were pending against Montelbano at the time of the instant trial.[3] As he did on December 7, Montelbano on September 29 made use of two accomplices; and he drove another car owned by Agnes Pollack, a 1967 Oldsmobile. Both thefts involved large quantities of seafood—a perishable commodity not easily disposed of in bulk.

Montelbano did not testify at the trial and he called no witnesses.

The jury returned a verdict on August 4, 1977 convicting Montelbano on each of the three counts of the indictment. On September 7, 1977, Judge Griesa sentenced him to five years imprisonment on each count, but ordered that the sentences be served concurrently. Bail having been denied after his conviction by the district court and by this Court, Montelbano has been serving his sentence.

### III.

In the light of these facts and prior proceedings, we turn directly to what we find to be the principal issue in the case, namely, whether the district court erred in declining to give, as requested, a cautionary instruction concerning the reliability of the eyewitness identification testimony. We hold, under the circumstances of this case, that it was not error.

We need hardly look further than Judge Friendly's characteristically perceptive opinion of two terms ago in *United States v. Marchand,* 564 F.2d 983, 997 (2 Cir. 1977), cert. denied, 434 U.S. 1015 (1978), to sustain

the district court's refusal to give the requested cautionary instruction in the instant case. *Marchand* is in accord with other recent decisions in this Circuit. See, e. g., *United States v. Gentile,* 530 F.2d 461, 469 (2 Cir.), cert. denied, 426 U.S. 936 (1976); *United States v. Evans,* 484 F.2d 1178, 1187–88 (2 Cir. 1973); *United States v. Fernandez,* 456 F.2d 638, 643–44 (2 Cir. 1972).

As with *Marchand, supra,* 564 F.2d at 985, this is not a case involving "dubious identifications". While Eme technically was a victim of the crime, id. at 986, his identification of Montelbano was based on close observation of him over a five hour period on the day of the hijacking. Eme sat next to Montelbano in both the truck and the Rambler for long intervals. Montelbano was not disguised in any way, nor was Eme's view obstructed. Eme's observation was such that he was able to identify Montelbano twice after the hijacking—once nine days later at FBI headquarters and again at trial. Despite the wide scope of cross-examination accorded to defense counsel, Eme's identification of Montelbano was never significantly undermined.

Moreover, as in *Marchand, supra,* 564 F.2d at 997, the conviction here did not rest alone on eyewitness identification testimony. There was unusually probative circumstantial evidence, false exculpatory evidence indicating consciousness of guilt, and prior similar act evidence. In short, aside from the identification testimony, the government's case was an overwhelming one. Indeed, on appeal appellant does not challenge the sufficiency of the evidence.

Although the district court declined to charge, as requested by appellant, specially concerning the reliability of eyewitness identification testimony, the court did give the usual instructions regarding the credibility of witnesses.

We hold on the facts of this case, and particularly in the light of Judge Friendly's recent opinion in *Marchand,* that failure to give the requested cautionary instruction was not error.

---

**3.** He later pleaded guilty to the count in the state court indictment which charged him with attempted burglary in the third degree arising from the Fiore Brothers theft.

We have carefully considered appellant's other claims of error and we find them to be without merit.

Affirmed.

LUMBARD, Circuit Judge (concurring):

I concur in the affirmance of the conviction.

FEINBERG, Circuit Judge, concurring:

I concur in the result of Judge Timbers' opinion. Despite the relative frequency with which this court has indicated a preference for a cautionary instruction on eyewitness identification, see *United States v. Lewis,* 565 F.2d 1248, 1253 (2d Cir. 1977), cert. denied, 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978); *United States v. Gentile,* 530 F.2d 461 (2d Cir.), cert. denied, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976); *United States v. Fernandez,* 456 F.2d 638, 643–44 (2d Cir. 1972), the charge is still not required under the law of this circuit. Thus, the failure to give it in this case is not reversible error.

I concur separately, however, because I believe the time has come for this court to give a model instruction for the district courts to use in the future. In this regard, I think the approach followed by the Third, Fourth, Seventh and District of Columbia Circuits is sound. See *United States v. Barber,* 442 F.2d 517, 525–28 (3d Cir.), cert. denied, 404 U.S. 846, 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971); *United States v. Holley,* 502 F.2d 273 (4th Cir. 1974); *United States v. Hodges,* 515 F.2d 650 (7th Cir. 1975); *United States v. Telfaire,* 152 U.S.App.D.C. 146, 469 F.2d 552 (1972). It is my hope that eventually a majority of this court will support the views there expressed.