37 F.3d 1501
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Roy McCARVER and Ernie McCarver, Defendants-Appellants.
 Nos. 93-3351, 93-3409.
 United States Court of Appeals, Seventh Circuit.
 Argued Sept. 8, 1994.
Decided Oct. 18, 1994.
 
 Before WELLFORD,* MANION and KANNE, Circuit Judges.
 
 ORDER
 
 1
 Ernie McCarver and Roy McCarver appeal convictions arising from their agreement to launder money generated by the sale of illegal drugs. Ernie challenges the trial court's admission of certain statements as evidence under the co-conspirator exception to hearsay, the trial court's refusal to instruct the jury on "reasonable doubt," and the calculation of his sentence under the Sentencing Guidelines. Roy challenges only the trial court's refusal to give an instruction defining "reasonable doubt." We affirm the district court in all respects.
 
 I. Facts
 
 2
 On December 3, 1992, a federal grand jury returned a thirty-count superseding indictment against nine people including Ernie and Roy McCarver. Ernie was charged with engaging in illegal monetary transactions in violation of 18 U.S.C. Sec. 1957, and money-laundering in violation of 18 U.S.C. Sec. 1956(a)(1)(B)(i). Both Roy and Ernie were charged with conspiracy to launder money and to engage in illegal monetary transactions in violation of 18 U.S.C. Sec. 371. Roy was charged with obstruction of justice in violation of 18 U.S.C. Sec. 1505. These charges arose from the government's investigation and prosecution of a far-flung and highly profitable illegal drug enterprise operated by their brother, Alvin McCarver.
 
 
 3
 Shortly before the trial began, the government filed a Santiago proffer, which treated Ernie as a member of Alvin's conspiracy.[1] Over Ernie's objection, the trial court made a preliminary finding that the statements offered by the government were admissible as statements made by Ernie's co-conspirators during the course and in the furtherance of Alvin's conspiracy. The case went forward to trial.
 
 
 4
 At trial the evidence showed that when Alvin McCarver left prison after serving time for the distribution of drugs, he returned to his old line of work. Alvin settled down in Hammond, Indiana, moving in with Linda Weaver. Somehow he amassed the capital needed to purchase a bale of marijuana, and by reinvesting the proceeds from its sale, he expanded his product line to include LSD, valium, cocaine, methamphetamine and other controlled substances.
 
 
 5
 Alvin's enterprise generated considerable profits. For example, on one occasion he purchased some 260 pounds of methamphetamine at a cost of over $3,000,000. Even with this sort of reinvestment, however, Alvin had more cash than he could handle. Before long he was burying money-stuffed coolers in his backyard (one cooler alone contained $850,000). He also began stashing $10,000 bundles of cash in the walls of his home.[2]
 
 
 6
 But all of this drug money was like salt water to the Ancient Mariner. Alvin needed to launder his money so he could enjoy it. Initially he sought to launder money through his closest friends and family members. But the legitimate income generated by these family members was fairly marginal, so Alvin began to consider other approaches. He needed more people whose legitimate income could mask his tremendous drug profits.
 
 
 7
 In 1987 Alvin contacted John Haak, the father of Alvin's one-time fellow fugitive, Robert Haak. John Haak had been gainfully employed for forty years, and Alvin thought Haak's earnings could account for about $300,000 in disposable savings. Alvin offered to pay Haak $50 per day for the use of his name and his services as a property manager. Haak agreed when Alvin promised to keep him out of drug distribution. As a result, properties previously purchased with Alvin's drug money were later put in Haak's name. From 1987 to 1991 Haak bought many properties for Alvin, but we need not describe Alvin's real estate empire at length. Suffice it to say that, at Alvin's direction, Haak bought a residence for Alvin's son, "Chip" McCarver, that was located at 2150 Rush Street.
 
 
 8
 In time Alvin put Steve Hutka on the payroll. Hutka's duties included maintaining the trailer park now owned by Alvin, and pricing apartment buildings that Alvin intended to purchase. Later, Alvin had Haak transfer many of his properties to Hutka, who became Alvin's new right-hand man.
 
 
 9
 Unfortunately, Haak purchased property worth much more than could be explained by his income. In June 1991 the IRS audited Haak. Alvin invented a story for Haak to say he found $200,000 in a locked box left to him by his mother. Although Haak dutifully recounted that story to the IRS, the IRS found it lacking to say the least. It is probably no coincidence that, at around this same time, Alvin brought his brothers Roy and Ernie into the money-laundering phase of his business.
 
 
 10
 Ernie's involvement began at least as early as January 18, 1991, when Haak bought a property at 5287 Central for $55,000 in the name of Ernie and Tina McCarver. Both Ernie and Tina were present at the closing, and title was put in Ernie's name since he could show some income. Later, on May 10, 1991, Haak arranged the purchase of a property at 5715 McCasland with money supplied by Alvin. Haak gave Ernie and Tina a cashier's check to make this purchase, and their names appear on the title. Chip signed Ernie's name at the closing, but it was Chip's understanding that Ernie knew about the transaction.
 
 
 11
 In January 1992, Chip purchased a 1988 GMC pickup truck and, with Ernie's permission, the title was put in Ernie's name. Chip put Ernie on the title because Ernie had some income to cover the purchase. Chip told Ernie he wanted to avoid criminal forfeiture laws. At Chip's request, and once again with Ernie's permission, Alvin also put title to Chip's home at 2150 Rush Street in Ernie's name. This involved transferring the title from Hutka to Ernie, and a paper transaction was structured to achieve this result.
 
 
 12
 Despite these transactions, Alvin continued to have an excess flow of drug money. In early 1992, Alvin and Linda Weaver visited Ernie in Michigan, and gave Ernie a shaving kit filled with cash. According to Linda, Alvin told Ernie to deposit the money in his bank account in small amounts, and to tell people he had inherited the money. Ernie deposited $50,000 in cash into his credit union account on March 3, 1992; $50,000 on March 6, 1992; $50,000 on March 9, 1992; and $50,000 on April 10, 1992. When Ernie brought the money in for deposit he told the bank tellers that he had inherited the money from his father.
 
 
 13
 Next, Alvin and Hutka formed a joint venture named McHut & Associates to buy commercial properties. On April 2, 1992, an account was opened in McHut's name at the Gainer Bank. Alvin told Hutka that Haak, Roy, and Ernie would be investing in the enterprise. On April 10, 1992, Hutka received a $100,000 check from Ernie's credit union made payable to Ernie McCarver or McHut. Hutka deposited the check in the McHut account. Hutka also received two $100,000 checks which Haak had purchased with Alvin's money.
 
 
 14
 Flush with cash, McHut & Associates arranged the purchase of several commercial properties. Relevant here is an offer to buy the Tepe's at 7820 Broadway in Merrillville, Indiana. McHut signed a purchase contract with a price of $900,000, and an undisclosed payment of $300,000. Hutka made a payment of $103,000 and a cash payment of $300,000 at closing. Alvin had supplied the cash. Roy and Ernie had visited Tepe's with Hutka.
 
 
 15
 Although these efforts temporarily disguised the cash, the source of the funds got exposed. DEA agents had Chip under surveillance for drug peddling, and on April 30, 1992, their search of Alvin's storage units yielded drugs, cutting materials, guns, ammunition, cars and motorcycles. Shortly thereafter, the DEA began to pick apart Alvin's business, and Ernie was exposed by this process. In May 1992, the DEA seized $109,000 from Ernie's credit union account. Alvin told Ernie and Roy to file a claim for the money. Before doing so, Ernie, Alvin, Hutka and Haak met at 2212 Crisman Road. At that meeting they agreed to tell the DEA that the money was derived from Roy's settlement of a wrongful death claim filed against four taverns when a drunken driver killed Roy's son. In August 1992, Ernie and Roy signed a claim for the seized money that comported with this story.
 
 
 16
 On October 30, 1992, Alvin and Chip were arrested separately by the DEA. At the time of his arrest, Chip was transporting two pounds of methamphetamine hidden inside a tire stored in the trunk of Chip's car. Roy was in the car with Chip as the officers closed in, and urged Chip to make a run for it. Later, Roy went to the police compound and tried, unsuccessfully, to get the tire with the methamphetamine.
 
 
 17
 This is just a minor portion of the evidence that was before the trial court when, at the close of trial, Ernie again objected to the government's Santiago proffer. Despite that objection the judge ruled that the statements offered into evidence by the government were non-hearsay statements of co-conspirators admissible under Fed.R.Evid. 801(d)(2)(E), and the government rested. Ernie and Roy tendered an instruction purporting to define "reasonable doubt" and the trial court refused to give that instruction. The jury convicted Roy and Ernie by returning a verdict of guilty on every count. At his sentencing hearing Ernie contested certain findings upon which his sentence is based. Ernie's objections were overruled, and he was sentenced to six and one-half years.
 
 II. Analysis
 A. Evidentiary Challenges
 
 18
 On appeal Ernie offers several challenges to the trial court's admission of evidence under Fed.R.Evid. 801(d)(2)(E). Ernie claims that the admission of statements made by other members of Alvin's drug peddling enterprise was improper because: (1) the government's proof of the existence of a conspiracy consisted only of hearsay statements; (2) some of the statements admitted by the court were made before Ernie joined the conspiracy; and (3) some statements concerned Alvin's drug conspiracy, not the money-laundering conspiracy with which Ernie was charged. With respect to Ernie's first two contentions, we review the trial court's factual findings concerning the admission of evidence for clear error. United States v. Ford, 21 F.3d 759, 763 (7th Cir.1994). With respect to Ernie's third contention, we examine the record for plain error as explained further below.
 
 
 19
 Ernie's first two contentions are easily dismissed. A trial court can consider hearsay statements to determine whether a conspiracy existed such that the statements are admissible under Fed.R.Evid. 801(d)(2)(E), if the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. United States v. Schumpert, 958 F.2d 770, 773 (7th Cir.1992), citing Bourjaily v. United States, 483 U.S. 171 (1987); United States v. Perez, 28 F.3d 673, 677 (7th Cir.1994). Likewise it is well established that once an individual joins a conspiracy the statements of his co-conspirators, even those made before he joined the conspiracy, are admissible against him. United States v. Adamo, 882 F.2d 1218, 1230-31 (7th Cir.1989); United States v. Potts, 840 F.2d 368, 372 (7th Cir.1987).
 
 
 20
 Finally, Ernie also argues that the trial court erred because it admitted hearsay statements made by persons who were not members of the money-laundering conspiracy. Essentially, Ernie argues that the money-laundering conspiracy is separate and distinct from Alvin's drug peddling conspiracy. Thus statements relating to Alvin's drug conspiracy are not, Ernie argues, statements made by his money-laundering co-conspirators during the course and in furtherance of that money-laundering conspiracy. Therefore, he argues, the admission of these hearsay statements was improper.
 
 
 21
 Ernie advanced this theory for the first time in oral argument on appeal. This theory was not the basis for his evidentiary objection at trial; Ernie did not brief the issue on appeal; and he has cited no authority to support his position. Indeed, he has not even identified those statements that he claims were improperly admitted. Therefore, we review the record only for plain error with respect to this contention. See United States v. South, 28 F.3d 619, 625 (7th Cir.1994); United States v. Maholias, 985 F.2d 869, 877 (7th Cir.1993). Consequently, we will only reverse if the error is "of such magnitude that it probably changed the outcome of the trial.... We reverse for plain error only when convinced that it is necessary in order to avert an actual miscarriage of justice." Maholias, 985 F.2d at 877 (citations omitted).
 
 
 22
 Ernie was charged for conspiracy to launder money under 18 U.S.C. Sec. 371, 18 U.S.C. Secs. 1956(a)(1)(B)(i), and 18 U.S.C. Sec. 1957(a). In order to convict Ernie under Sec. 1956, the government was required to prove that Ernie conspired to conduct a financial transaction with knowledge that: (1) the property involved in that transaction represented the proceeds of a specified unlawful activity; and (2) the transaction was designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of specified unlawful activity. 18 U.S.C. Sec. 1956. In order to convict Ernie under Sec. 1957 the government was obliged to show that Ernie conspired to engage in a monetary transaction with knowledge that the transaction involved property derived from a criminal activity. 18 U.S.C. Sec. 1957.
 
 
 23
 The evidence offered by the government--to the extent it contains hearsay at all--is directly relevant to the laundering of Alvin's drug money. For example, Chip testified that on several occasions he asked Ernie to put title to certain properties in his name, and that Ernie agreed to help him. Chip also testified that he told Ernie that he needed to hide his money, and that Ernie knew the money came from drug sales.
 
 
 24
 Likewise, Linda Weaver testified that she and Alvin visited Ernie in Michigan to deliver a shaving kit filled with cash. According to Weaver, Alvin told Ernie to deposit the money in small amounts, and that if anyone asked where the money came from, then Ernie should say it was an inheritance. The tellers at Ernie's bank testified that he made four $50,000 deposits in the few weeks after Alvin's visit. They also testified that Ernie told them he had inherited the money. Finally, Ernie filed claims for the money seized from his bank account by the DEA, and offered the explanation for his possession of those funds concocted during his meeting with Alvin at 2212 Crisman Road.
 
 
 25
 Given these facts, the trial court's decision to admit statements made by Alvin's co-conspirators against Ernie was not close to clear error, let alone the plain error needed to justify reversal here. All of the evidence offered by the government tends to prove the elements of the money-laundering conspiracy with which Ernie was charged, most notably the specific illegal activity which generated the money that Ernie agreed to launder. The trial court could easily conclude that these statements were made by co-conspirators during the course and in furtherance of the money-laundering conspiracy such that they were admissible under Fed.R.Evid. 801(d)(2)(E).
 
 
 26
 Other principles of conspiracy are relevant here. For example, co-conspirators "do not have to have contact with, or even know, all of the other conspirators." United States v. Goines, 988 F.2d 750, 759 (7th Cir.1993). In order to show involvement in a single conspiracy it is sufficient to establish that co-conspirators knowingly embraced a common objective, and knew or had reason to know that their benefits derived from, and were dependent upon, the success of the entire enterprise. United States v. Herrero, 893 F.2d 1512, 1532 (7th Cir.1990). Further, the fact-finder is entitled and expected to draw on common sense in evaluating whether it is reasonable to infer membership in a conspiracy from circumstantial evidence. See Troop, 890 F.2d at 1397.
 
 
 27
 These cases also have clear and unfavorable implications for Ernie's argument that he was a member of some separate and lesser money-laundering conspiracy but not Alvin's drug conspiracy. They indicate that the trial judge could admit any and all statements by Alvin's co-conspirators if the court could find that Ernie agreed to commit an illegal act, and had some knowledge of the general scope and objective of Alvin's conspiracy; or that Ernie embraced a common objective, and knew or had reason to know that his benefit and success derived from, and was dependent upon, the success of Alvin's drug peddling. The government produced ample evidence from which the trial court could find that Ernie joined Alvin's conspiracy. Under these circumstances, the statements by Alvin's co-conspirators were admissible against Ernie under Fed.R.Evid. 801(d)(2)(E). Ernie's theories fail under any standard.
 
 B. Challenges to the Jury Instructions
 
 28
 At trial both Roy and Ernie offered an instruction defining "reasonable doubt." The judge refused to give their instruction, and they now allege that their right to due process and a jury trial was violated as a result. We review the trial court's decision for an abuse of discretion. United States v. Tilmon, 19 F.3d 1221, 1231 (7th Cir.1994). We conclude that the trial court did not abuse its discretion because the due process clause does not require that the jury be instructed on the meaning of "reasonable doubt." Victor v. Nebraska, --- U.S. ----, 114 S.Ct. 1239, 1243 (1994) ("[T]he Constitution neither prohibits the trial courts from defining reasonable doubt nor requires them to do so as a matter of course.").
 
 
 29
 Indeed, this court has consistently recommended that trial courts refrain from any attempt to define "reasonable doubt." United States v. Hanson, 994 F.2d 403, 408 (7th Cir.1993). We do so because "at best, definitions of reasonable doubt are unhelpful to a jury, and, at worst, they have the potential to impair a defendant's constitutional right to have the government prove each element beyond a reasonable doubt. An attempt to define reasonable doubt presents a risk without any real benefit." United States v. Hall, 854 F.2d 1036, 1039 (7th Cir.1988). The point is illustrated by Sullivan v. Louisiana, --- U.S. ---- 113 S.Ct. 2078 (1993), where the Supreme Court reversed a conviction because the instruction defining "reasonable doubt" arguably lessened the state's burden of proof. The trial court prudently avoided this risk when it refused the offered instruction.
 
 C. Sentencing Challenges
 
 30
 Ernie also argues that the trial court incorrectly applied the Sentencing Guidelines when calculating his sentence. First he claims that the $83,606.31 value of the property at 5715 McCasland should not be included when determining the total value of funds laundered under Sentencing Guideline Sec. 2S1.1, because the government dropped charges arising from that transaction. But the Guidelines do not limit the conduct considered for sentencing purposes to charged conduct. Rather, relevant conduct includes all acts and omissions that were part of the common scheme or plan. U.S.S.G. Sec. 1B1.3(a)(2). United States v. Tucker, 20 F.3d 242, 245 (7th Cir.1994). Moreover any error would be harmless, because deducting $80,606.31 from the total value of funds laundered by Ernie would still leave a total value above $200,000.00. Thus, Ernie would still be subjected to the same two-level increase under Sec. 2S1.1(b)(2)(C).
 
 
 31
 Ernie argues that the trial court engaged in impermissible double counting by enhancing his sentence for both the source and total value of the funds he laundered. The Guidelines generally do not authorize double counting. Impermissible double counting can occur in at least two ways.[3] First, when the same underlying facts that establish an element of a base offense are used to justify an upward departure. See United States v. Lallemand, 989 F.2d 936, 939 (7th Cir.1993); United States v. Kopshever, 6 F.3d 1218, 1224 (7th Cir.1993). Second, when the same underlying facts are used to justify enhancements under two different sections of the Guidelines. See United States v. Doubet, 969 F.2d 341, 348 (7th Cir.1992). The critical inquiry is whether the quality of the conduct that triggers one provision necessarily triggers the other. See Doubet, 969 F.2d at 347; United States v. Reese, 2 F.3d 870, 895 (9th Cir.1993).
 
 
 32
 Under either test Ernie has no argument. Guideline Sec. 2S1.1 governs money-laundering in general, provides no enhancement if laundered funds total less than $100,000, and contains a separate enhancement for the source and amount of the laundered funds. It is apparent that the base offense provision can be triggered without triggering the enhancements, and that one enhancement can be triggered without necessarily triggering the other. Ernie's problem is that his conduct triggered each provision, not that there was double counting. Ernie's sentence is proper.
 
 III. Conclusion
 For the foregoing reasons, we
 
 33
 AFFIRM.
 
 
 
 *
 Hon. Harry W. Wellford, Circuit Judge of the United States Court of Appeals, Sixth Circuit, is sitting by designation
 
 
 [1]
 Federal Rule of Evidence 801(d)(2)(E) creates an exclusion from hearsay for statements made by a co-conspirator of a party during the course and in furtherance of a conspiracy. In United States v. Santiago, 582 F.2d 1128, 1130-31 (7th Cir.1978), we held that when a co-conspirator's statement is offered by the government pursuant to 801(d)(2)(E), the district court must make a preliminary finding that: (1) a conspiracy exists; (2) the defendant and declarant were members of that conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy. Evidence offered to satisfy this requirement is referred to as a Santiago proffer. See United States v. Rodriguez, 975 F.2d 404 (7th Cir.1992)
 
 
 [2]
 Ultimately, the DEA recovered $2,403,050 in cash that was hidden on Alvin's properties, and seized some $6,000,000 worth of cash and property
 
 
 [3]
 We note that double counting is not always wrong. See United States v. Reese, 2 F.3d 870, 894-95 (9th Cir.1993)