**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**George A. DOUBET, Defendant–
Appellant.**

No. 91–1979.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 28, 1992.

Decided July 20, 1992.

As Amended Aug. 26, 1992.

Darilynn J. Knauss, Asst. U.S. Atty., Peoria, Ill., Rodger A. Heaton, Asst. U.S. Atty. (argued), Springfield, Ill., for plaintiff-appellee.

Richard H. Parsons, Peoria, Ill. (argued), for defendant-appellant.

Before POSNER, FLAUM and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

A jury convicted George Doubet of bank robbery, armed bank robbery, using a firearm during a crime of violence, and possession of a sawed-off shotgun, 18 U.S.C. §§ 2113(a), (d), 924(c)(1), 26 U.S.C. §§ 5861(d) and 5871, and the district court sentenced him to 130 months in jail. On appeal, Doubet challenges both the district court's denial of his motion to suppress statements he made to the police on the day of his arrest, as well as enhancements of his sentence for physical restraint and obstruction of justice. We affirm.

## I.

At about noon on November 10, 1990, an armed man wearing a blue ski mask and clad in a navy blue hooded sweatshirt, blue jeans, and yellow gloves entered the First Financial Bank in Elmwood, Illinois, approached the tellers' counter, and declared, "This is a hold-up." The man then proceeded to jump over the counter, and instructed the three tellers to move in the direction of a back room. He ushered them to the room, and, uttering threats, directed them further into a restroom within the back room. After approximately five minutes had passed, the employees ventured out and, discovering the gunman had fled, activated the alarm. Some $12,280 had been stolen, including $300 bearing previously recorded serial numbers.

After FBI agents interviewed the tellers, George Doubet became a potential suspect; he physically resembled the gunman, had been in the bank less than an hour before the robbery to withdraw forty dollars from a checking account he had opened the previous evening, and had requested to use the restroom, even though he lived only about 200 yards from the bank. Moreover, an individual living near the bank reported that he saw a man wearing a blue hooded sweatshirt and a surgical-type mask at about noon that day walking up the alley toward the bank from the direction of Doubet's house.

Based on this information, FBI agents placed Doubet's house under surveillance. At about 4:30 p.m. that afternoon, agents

observed Doubet and his family drive up to their home and go inside. About thirty minutes later, the family left the residence and began to drive away. At Agent Frank Mulcahey's request, Elmwood Police Chief Thomas Thompson stopped Doubet's car. Doubet stepped out as Thompson and FBI agents approached him. Thompson asked Doubet if he would be willing to speak with Mulcahey; Doubet agreed, and Mulcahey approached Doubet and asked him to accompany him to the police station for questioning. Doubet responded, "Fine. No problem."

With the law enforcement officials in tow, Doubet got back in his car, returned home, got out of his car and into the squad car, and rode with Mulcahey and fellow agent Gregory Spencer to the police station where they led him to Thompson's office for questioning. According to Mulcahey, he told Doubet about the bank robbery, and stated that he and Spencer wanted to question him about his activities that day. He further told Doubet that he was not under arrest and was free to leave at any time, to which Doubet responded that he understood he could leave.

In the meantime, two FBI agents remained with Doubet's wife and three children at the Doubets' residence, where they interviewed Mrs. Doubet. After roughly thirty to forty minutes had passed, one of the agents at the Doubets' house, David Hirtz, discussed the Doubets' respective statements in a telephone conversation with Mulcahey. Finding inconsistencies, they decided to seek consent to search Doubet's home and car, and a search warrant should consent be refused. Mulcahey then permitted Doubet to speak with his wife. After the phone call, Mulcahey, as planned, asked Doubet for permission to seach his car; Doubet refused, and further stated that he wanted to end his discussion with the agents. The agents discontinued the questioning and two officers drove Doubet home. Mrs. Doubet, likewise, denied Hirtz's request for consent to search their home. Hirtz then told her that a warrant was being sought, and that agents would be securing the house to prevent the destruction of any evidence.

Agents remained in the Doubets' house for approximately six hours, until the warrants for the house and car were executed. During this period, they told Mrs. Doubet they would leave if the Doubets would leave as well; they opted to remain. The agents also denied a request by Doubet to go to the bedroom with his wife, on the ground that it presented a potential risk of destruction of evidence in the bedroom. The search of the house and car ultimately uncovered several inculpatory items, including approximately $7,000 in cash (including some $300 in marked money), shotgun shells, and the stock from a sawed-off shotgun.

## II.

Doubet first claims the district court should have suppressed statements he made to law enforcement officials on the day of his arrest regarding his activities and whereabouts on the day the robbery occurred. We will not overturn the district court's denial of a motion to suppress unless the decision was clearly erroneous. *United States v. Williams*, 945 F.2d 192, 195 (7th Cir.1991); *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991). Our inquiry is, for the most part, "factually based and requires that we give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses." *Williams*, 945 F.2d at 195 (quoting *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir. 1990)). To the extent that legal determinations factor into a suppression ruling, they are subject to *de novo* review. *Williams*, 945 F.2d at 195–96 (citing *United States v. Parker*, 936 F.2d 950, 953 n. 1 (7th Cir. 1991) (collecting cases)).

Doubet initially attacks the admission of his statements on the ground that the police failed to give him *Miranda* warnings prior to questioning. Since law enforcement officers need not administer *Miranda* warnings to suspects who are questioned outside of a custodial setting, *Unit-*

ed States v. Levy, 955 F.2d 1098, 1103 (7th Cir.1992) (citing Illinois v. Perkins, 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990)), petition for cert. filed (Apr. 1, 1992), the threshold inquiry is whether the police placed "such a restriction on [Doubet's] freedom as to render him 'in custody.'" Levy, 955 F.2d at 1103 (quoting United States v. Fazio, 914 F.2d 950, 954 (7th Cir.1990)). When reviewing the district court's determination on the issue of custody, we will not disturb its underlying factual findings and credibility determinations unless they are clearly erroneous. Id.; Fazio, 914 F.2d at 955.

Doubet testified at the suppression hearing that when he was pulled over, police cars surrounded his car and several officers were present at the scene. He admitted that he initially agreed to speak to Mulcahey, but contended that an FBI agent took him by the elbow and placed him in the police car, and that he felt he was under arrest from that point forward. He further stated that he was frisked at the police station. According to Doubet, Spencer sat next to the sole exit in Thompson's office during questioning, with his revolver visible to Doubet, further contributing to Doubet's perception that he was not free to leave.

Doubet also testified at the suppression hearing, contrary to the testimony of the FBI agents and Thompson, that he was never told that he was not under arrest or free to leave. On this point, the district court explicitly believed the agents' version, finding that Doubet was informed on at least one occasion—when the interview at the police station commenced—that he was not under arrest. Moreover, the district court found it important that after approximately thirty to forty minutes of questioning and his telephone conversation with his wife, Doubet refused to continue with questioning, would not give consent to a search, and requested to leave. According to the court, this was "inconsistent with the testimony that ... he felt he was wholly dominated or intimidated by the agents...." Suppression Hrg. at 92. The court also noted that once Doubet indicated he did not want to answer further ques-

tions, the agents terminated the interview. The district court had the opportunity to observe firsthand the witnesses' credibility, and we do not find its determination clearly erroneous. We hold that it did not err in finding that Doubet was not in custody, and therefore not entitled to Miranda warnings.

■ Relying on United States v. Rivera, 906 F.2d 319 (7th Cir.1990), and Segura v. United States, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), Doubet further contends that his statements should have been suppressed because he was allegedly detained an unreasonable length of time prior to his arrest. In Rivera, the defendant unsuccessfully argued that cocaine found in his car should have been suppressed as evidence because the trooper's investigative search greatly exceeded any legitimate duration and scope. Although we noted that "[t]he constitution restricts the duration of a seizure to the duration necessary to fulfill the seizure's purpose," Rivera, 906 F.2d at 322, we held that the trooper had not exceeded constitutional bounds in engaging in limited discourse with Rivera and his passenger. Although in dicta we stated the general principle that the duration of a seizure is not unlimited, the fact pattern in Rivera—a trooper's investigative detention of a driver after the initial stop—is inapposite to the situation here.

Segura provides a more apt analogy. There, officers had entered and secured an apartment for a 19-hour period to prevent the destruction of evidence while seeking a search warrant. Although the entry was illegal, the warrant was obtained based on information gathered before the illegal entry occurred. The Supreme Court upheld the denial of the motion to suppress, holding that the government, while seeking a warrant, may secure the apartment on the basis of probable cause to prevent the destruction or removal of evidence. Segura, 468 U.S. at 810, 104 S.Ct. at 3388. The Court recognized that "a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration." Id. at 812, 104 S.Ct. at 3389. Significantly, however, it

held that the length of the seizure there was not unreasonable given the agents' lack of bad faith, the lack of evidence that the agents in any way exploited their presence in the apartment—they "simply awaited issuance of the warrant," *id.* at 813, 104 S.Ct. at 3389—and the evening hours during which the delay occurred, as it was "reasonable to assume that judicial officers are not as readily available for consideration of warrant requests" at a late hour. *Id.* at 812–13, 104 S.Ct. at 3389. Although the Court also found it significant that any intrusion on possessory interests was "virtually nonexistent" because the petitioners were under arrest and in police custody throughout, *id.* at 813, 104 S.Ct. at 3390, we believe that this distinction, in itself, is not sufficient to warrant a determination that the seizure here was unreasonable.

Doubet was initially pulled over at approximately 5:00 p.m., and arrested at about midnight. During that time, he was questioned for less than one hour; the rest of the time, agents secured Doubet's residence and car while awaiting a search warrant. We find the time span reasonable under the circumstances. There is no evidence that the agents displayed bad faith by intentionally delaying the effort to obtain a warrant. Nor did they exploit their presence in the Doubet home. Although Doubet makes a few (weak) assertions to the contrary, including the contention that they exploited their presence by refusing to permit the Doubets to go to the bedroom together, we find the agents' actions reasonable given concerns over potential destruction of evidence. Finally, the seizure, as in *Segura,* occurred during evening hours when judicial officers are not as readily accessible. Here, as in *Segura,* the purpose of the agents' presence was to preserve the "status quo" and to prevent the destruction of evidence. As *Segura* recognized, "Unless there is some kind of a power to prevent removal of material from the premises, or destruction of material during this time, the search warrant will almost inevitably be fruitless." *Id.* at 809 n. 7, 104 S.Ct. at 3388 n. 7 (quoting Griswold, *Criminal Procedure, 1969—Is It a Means or an End?,* 29 Md.L.Rev. 307, 317 (1969)).

Moreover, read literally, Doubet's claim actually is that he, personally, was detained an unconstitutionally excessive length of time. *See* Appellant's Br. at 19. As noted, however, his questioning lasted less than an hour. Although his premises were secured during the remainder of the evening, Doubet and his wife were told that they were free to leave the residence if they so desired, but that the residence would be monitored if they chose to stay. And, significantly, Doubet was not interrogated at the house. This might be, as the district court recognized, a different situation had he been questioned there. The agents' presence was not unreasonable, and the motion to suppress was properly denied.

### III.

In sentencing Doubet, the district court, relying on the presentence report, calculated a base offense level of 20. It then proceeded to enhance Doubet's sentence on four grounds, two of which are at issue here, resulting in an adjusted offense level of 27. This level, when combined with a criminal history category of I, yielded a 70–87 month sentencing range for the bank robbery and possession of sawed-off shotgun counts, and 60 consecutive months for the conviction for using a firearm during a crime of violence. The court sentenced Doubet to 130 months' imprisonment. Doubet protests here, as he did below, the two two-level enhancements imposed by the district court for physical restraint of a victim under § 2B3.1(b)(4) and obstruction of justice pursuant to § 3C1.1.

### A.

"Physical restraint" is included within the Guidelines' specific offense characteristics for robbery; the Guidelines mandate a two-level increase in offense level "if any person was physically restrained to facilitate commission of the offense or to facilitate escape...." U.S.S.G. § 2B3.1(b)(4)(B). Section 1B1.1, to which Application Note 1 of § 2B3.1 refers, provides that " 'physically restrained' means

the forcible restraint of the victim *such as* being tied, bound, or *locked up."* *Id.* § 1B1.1 (emphasis added). Similarly, the commentary to § 2B3.1 notes that the Guidelines provide an enhancement "for robberies where a victim was forced to accompany the defendant to another location, or was physically restrained by being tied, bound, or locked up."

The evidence at trial showed that Doubet entered the bank carrying a sawed-off shotgun, pointed it in the direction of three bank tellers, and ordered them to retreat to the room at the rear of the bank. Once inside the room, Doubet further directed them into a small restroom in the back of that room, declaring, "[i]f you peek your head out, I'll blow your f—ing head off." Doubet contends here, as he did before the district court, that the tellers were not physically restrained: "They were not bound or in any way touched.... They were ordered to enter an unlocked restroom which was near an unlocked, unguarded exit. They could have left." Appellant's Br. at 25. This characterization, however, omits several essential facts. When he ordered the employees into the back room, Doubet was carrying a sawed-off shotgun, which he pointed in the tellers' direction while commanding them to enter the room. Once inside, he directed them further into the restroom and issued death threats while brandishing the weapon.

We digress a moment to note the seeming incongruity between Doubet's argument here and his earlier argument in support of his motion to suppress. There, Doubet claimed that he felt that he was in custody and not free to leave because agent Spencer sat near the exit, with his holstered weapon in plain view. Here, however, he argues that bank tellers herded into a small room and threatened with death by a masked man wielding a sawed-off shotgun "could have left." Although the contexts are admittedly distinct, we find the arguments a bit difficult to reconcile.

This observation aside, we find that the enhancement was justified. A contention that the victims were not physically restrained because the restroom was not locked, as in bolted shut, is an overly literal, and, we believe, overly restrictive interpretation of "physical restraint" as that term is contemplated by the Guidelines. Indeed, the use of the qualifying phrase "such as," makes it "apparent that 'being tied, bound, or locked up' are listed by way of example rather than limitation." *United States v. Stokley,* 881 F.2d 114, 116 (4th Cir.1989); *accord Arcoren v. United States,* 929 F.2d 1235, 1246 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991); *United States v. Roberts,* 898 F.2d 1465, 1470 (10th Cir.1990) (citing *Stokley* ).

This is not to say that herding victims into a defined area necessarily constitutes "physical restraint." Although the government seemed to urge such an expansive interpretation at argument, such an approach, in our view, lacks a limiting principle. Doubet argues as much, contending that sequestering the tellers in the bathroom can be equated with simply directing them to one side of the room and admonishing them not to move. Indeed, we agree that such action, in itself, would likely not suffice to justify enhancement. Were it otherwise, enhancement would be warranted virtually every time an armed robber entered a bank, for a threat not to move is implicit in the very nature of armed robbery.

To reiterate, the purpose of this enhancement is to punish criminals who use "physical restraint" to "facilitate the commission of the offense." § 2B3.1(b)(4)(B). A review of other cases addressing enhancements for physical restraint is instructive. In *United States v. Stokley, supra,* for example, the defendant placed explosives in a room and prevented the victim from leaving. The bomb went off, injuring both. The defendant pled guilty to destroying with explosives property affecting interstate commerce in a manner that resulted in personal injury, 18 U.S.C. § 844(i), but challenged an enhancement for physical restraint pursuant to Guideline § 3A1.3. The court upheld the enhancement, noting: "That a victim need not be tied or bound up so that his movement is completely restrict-

ed is made apparent by the 'locked up' example given in the commentary." *Stokley*, 881 F.2d at 116; *see also United States v. Lucas*, 889 F.2d 697 (6th Cir.1989) (noting district court's observation that when defendant herded victims at gunpoint, and forced them to disrobe and remain in the vault or break room, he arguably " 'restrained' them to facilitate his escape.").[1] In *United States v. Mikalajunas*, 936 F.2d 153, 156 (4th Cir.1991), which involved a stabbing murder, the court rejected a physical restraint enhancement because the unlawful act of stabbing "normally will involve some physical restraint." The court distinguished *Stokley*, observing that there (1) the victim was confined to a room for some time; and (2) detonation of an explosive, in and of itself, does not involve physical restraint; rather it "add[ed] something to the offense that the victim had an apprehension of the expected blast and *could do nothing about it because of the physical restraint.*" *Id.* at 156 (emphasis added). These observations are relevant here for, as in *Stokley*, the restraint "added something" to the offense—*i.e.*, in the words of the Guidelines, the restraint facilitated the commission of the bank robbery. The tellers were, for all intents and purposes, confined to the restroom. Although the defendant in *Stokley* physically barred the victim from leaving the room, here, as there, the victims could do nothing about their situation because of the physical restraint.

Moreover, looking again to the Guidelines' definition, physical restraint is the *"forcible* restraint of the victim such as being tied, bound, or locked up." (emphasis added). "Force" is not limited to *physi-*

cal force, but may also encompass "the operation of circumstances that permit no alternative to compliance." The American Heritage Dictionary of the English Language at 513 (10th ed. 1981). Here, Doubet's victims were led to an isolated room within a room which was effectively secured by Doubet's threats of death while carrying the sawed-off shotgun, as well as an admonition by Doubet that an armed accomplice stood guard outside the door. This illusory accomplice, along with Doubet's actions, served as a figurative lock and key sufficient to constitute a physical restraint which facilitated the commission of the offense.[2]

■ Doubet also offers a somewhat related argument, claiming that the enhancement on physical restraint grounds constitutes double counting. He maintains that since the adjustment for physical restraint does not apply "where the unlawful restraint of a victim is an element of the offense itself," § 3A1.3 comment. (n. 2), it should not apply here because "by the very definition of bank robbery there is a use of force, violence, and intimidation which is part and parcel of and is inclusive of 'physical restraint.' " Appellant's Br. at 24. But, as alluded to above, robbery does not necessarily entail physical restraint. *See Mikalajunas*, 936 F.2d at 156 ("[R]obbery encompasses many fact patterns. Robbery need not involve a physical holding, and one can envision various types of robberies involving no restraint at all."). Were it otherwise, the Guidelines would not list physical restraint in § 2B3.1 as a specific offense characteristic for robbery warranting a two-level enhancement.

---

1. We take a moment to express our concerns with the government's characterization of the *Lucas* case to this Court. The government argued in its brief that *Lucas* upheld the physical restraint enhancement; in fact, the court in *Lucas* explicitly declined to reach the issue, and merely noted, in dicta, the district court's determination. Although the government acknowledged the error at argument, we are troubled— given its reliance on the case in its brief—that this acknowledgement came at such a late stage.

2. We also observe that the government, had it so chosen, could have raised other grounds for enhancement, such as an express threat of death, *see* § 2B3.1(b)(2)(F), but apparently instead selected one which it felt most fully covered Doubet's overall behavior.

Doubet would have a valid double-counting argument had the district court applied the two-level enhancement for physical restraint pursuant to § 2B3.1(b)(4)(B), and then proceeded to apply the physical restraint enhancement pursuant to the victim-related adjustment category, "Restraint of Victim," in § 3A1.3. As we observed in *United States v. Tholl*, 895 F.2d 1178, 1185 (7th Cir.1990):

> The exceptions to section 3A1.3 merely prevent double-counting of physical restraint under section 3A1.3 when a two-level increase for physical restraint already has been taken into account under the base offense of the specific offense characteristic, or when the act of physical restraint is an element of the underlying offense.

Here, the court applied the physical restraint enhancement only once, pursuant to § 2B3.1(b)(4)(B), and acted within its authority in doing so.

### B.

■ Doubet finally contends the district court improperly enhanced his base offense level by two points for obstruction of justice under § 3C1.1, which provides: "If the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the offense level by 2 levels." The district court's determination in this regard is a finding of fact, which we review under a clearly erroneous standard. *United States v. Feekes*, 929 F.2d 334, 338 (7th Cir.1991); *United States v. Brown*, 900 F.2d 1098, 1103 (7th Cir. 1990).

Doubet maintains the district court, which cited perjury as the basis for the enhancement, grounded its determination on the jury's guilty verdict rather than an independent finding of perjury. We previously have held that § 3C1.1 may be applied to increase the sentence of a defendant who testifies untruthfully at trial. *United States v. Contreras*, 937 F.2d 1191 (7th Cir.1991). Doubet, however, citing *United States v. Lozoya–Morales*, 931 F.2d

1216 (7th Cir.1991), claims the enhancement here cannot stand because it was predicated entirely upon the guilty verdict rather than a factual finding of perjury. In *Lozoya–Morales*, we held that an adjustment for obstruction of justice, absent an independent finding by the district court that the defendant had lied, was improper, observing that "[i]mposing the penalty automatically from a jury verdict that concededly does not establish the defendant lied in his testimony impinges upon the right to testify in one's behalf." *Id.* at 1219.

In sentencing Doubet, the district court said the following:

> [I]f [Doubet] is guilty beyond a reasonable doubt, *and I am confident that he is*, then he committed perjury. He took the stand and made explicit statements about his whereabouts and his activities on the morning the offense was committed, *denied not just his participation but offered explanation* [sic] *of his activities that were incompatible with what the bank robber did*. The jury concluded beyond a reasonable doubt, *and I am persuaded properly*, that [Doubet] was guilty as charged, and if he is guilty as charged, then he committed perjury. Perjury is one of the specific activities to which the enhancement for obstruction of justice applies.

Sentencing Tr. at 12–13 (emphasis added). These comments, we believe, provide a sufficient independent factual basis to support the adjustment; as indicated by the emphasized language, the court adequately considered not merely the jury verdict, but also Doubet's own statements, and independently assessed the credibility of that testimony.

That the district judge at sentencing referenced both *United States v. Fiala*, 929 F.2d 285 (7th Cir.1991), and *Feekes, supra*, further buttresses this view. The court explained why *Fiala*, which held that a mere denial of guilt is an insufficient basis for a § 3C1.1 enhancement, was inapposite, and *Feekes*, which allowed an upward adjustment where the district court concluded that the defendant had committed perjury given his false testimony at trial, was appli-

cable, and stated, "[W]hat happened here is that [Doubet] took the stand in the trial and under oath made perjurious statements." The district court's statements show that it made an independent finding of perjury sufficient to support the obstruction of justice enhancement.

 Further, we stated in *Lozoya–Morales* that "[w]hen a judge enhances the sentence under § 3C1.1 on the basis of trial testimony, and does not make an independent finding that the defendant told a material lie on the stand, we will insist that the record clearly demonstrates that the jury *must* have found such a falsehood." 931 F.2d at 1219–20. We find the record here establishes that the jury must have found such a falsehood, thereby providing independent support for the enhancement. Doubet provided a detailed account of his whereabouts and activities on the day of the robbery which the jury must have rejected as false in rendering a verdict of guilty. This does not implicate his constitutional rights, for these detailed statements were more than a mere denial of guilt. *See Fiala*, 929 F.2d at 290. The two-level enhancement for obstruction of justice was not clearly erroneous.

\*   \*   \*

For the foregoing reasons, the decision of the district court is

AFFIRMED.