**UNITED STATES of America, Appellee,**

v.

**Michael ANGLIN, Defendant–Appellant.**

**Docket No. 98–1340**

United States Court of Appeals,
Second Circuit.

Argued Jan. 15, 1999.

Decided March 2, 1999.

Steven R. Peikin, Assistant United States Attorney (Christine H. Chung of counsel; Mary Jo White, United States Attorney for the Southern District of New York), New York, New York, for Appellee.

Mitchell A. Golub, Golub & Golub (Susan L. Peters, of counsel), New York, New York, for Defendant–Appellant.

Before: WINTER, Chief Judge, KEARSE, Circuit Judge, and HAIGHT, District Judge.*

HAIGHT, District Judge:

Defendant-appellant Michael Anglin appeals from his conviction in the United States District Court for the Southern District of New York following a jury trial before Dominick L. DiCarlo, Senior Judge of the Court of International Trade, sitting by designation. The jury convicted Anglin on charges relating to the armed robbery of a bank. Anglin also appeals from the sentence imposed by the district court. For the reasons

---

* The Honorable Charles S. Haight, Jr. of the United States District Court for the Southern District of New York, sitting by designation.

that follow, we affirm Anglin's conviction, vacate his sentence, and remand for resentencing.

## BACKGROUND

### The Procedural History of the Case

During the morning of April 16, 1996, an armed individual and an accomplice robbed an on-site branch bank (the "City College Branch" or the "Branch") operated by Chemical Bank in a room on the ground floor of Shepherd Hall, a college building maintained by the City College of New York at 270 Convent Avenue, New York, N.Y. Chemical Bank established the Branch as part of a program by which it provided on-site banking services at institutions such as colleges, hospitals, insurance agencies, and brokerage firms.[1] The City College Branch was open only on days that City College distributed financial-aid checks to students, and its business consisted primarily of cashing those checks. The robber and his accomplice fled the scene with more than $610,000.

Although the accomplice was never identified, the government proceeded against defendant-appellant Anglin on the theory that he was the armed robber. On April 2, 1997, the government presented an indictment charging Anglin in four counts: One, conspiring to commit the bank robbery, in violation of 18 U.S.C. § 371; Two, committing the robbery, in violation of 18 U.S.C. §§ 2113(a) and 2; Three, committing the robbery with the use of a gun, in violation of 18 U.S.C. §§ 2113(d) and 2; and Four, using and carrying a firearm in connection with the bank robbery charged in Counts Two and Three, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c) and 2.

In a superseding indictment filed on August 1, 1997, the government repleaded those counts and charged Anglin in three additional counts: Five, money laundering in connection with his use of some of the bank robbery proceeds to purchase an automobile, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); Six, money laundering in connection with his use of some of the bank robbery proceeds to purchase $6,000 in money orders using an assumed name, in violation of the same statute; and Seven, engaging in a monetary transaction in criminally derived property greater than $10,000 in value, in connection with his purchase of the automobile, in violation of 18 U.S.C. § 1957.

The trial began on November 3, 1997, before Judge DiCarlo and a jury. On November 10, before resting its case in chief, the government moved on its own initiative to dismiss the three money laundering counts (Counts Five, Six and Seven) and the aiding and abetting charge in Count Four (using and carrying a firearm). The district court granted the government's motion. Defense counsel then moved to strike testimony the government had elicited about defendant's post-robbery purchases, on the ground that such evidence was relevant only to the money laundering counts, now dismissed. The district court denied that motion. On November 12, the jury returned its verdict, convicting Anglin on the four remaining counts. The district court denied Anglin's motion under Fed. R. Crim P. 29(c) for a judgment of acquittal after discharge of the jury.

On May 22, 1998, Judge DiCarlo sentenced Anglin to a term of 96 months' incarceration on Counts Two and Three (the bank robbery and armed bank robbery counts), which were deemed merged; a concurrent term of 60 months' incarceration on Count One (the conspiracy count); and a consecutive 60–months' incarceration on Count Four (the firearms count). Judge DiCarlo also sentenced Anglin to a term of five years of supervised release on Counts One and Four and concurrent three-year terms of supervised release on Counts One and Four. The district court imposed mandatory special assessments totaling $150 and ordered Anglin to pay $610,-000 in restitution to Chemical Bank.

In sentencing Anglin to a term of 96 months on Counts Two and Three, Judge DiCarlo included in his calculations a 2–level increase in the severity of the offense pursuant to § 2B3.1(b)(4)(B) of the United States Sentencing Guidelines ("U.S.S.G."). That section provides: "if any person was physically restrained to facilitate the commission

---

1. Before the trial of the case, Chemical Bank merged with Chase Manhattan Bank.

of the offense or to facilitate escape, increase by 2 levels."

Anglin currently is serving his sentence.

*The Trial Evidence*

The defense at trial was mistaken identity. Anglin did not take the stand, and called no witnesses, but defense counsel's opening statement, cross-examination of government witnesses, and summation made manifest Anglin's theory of the case: he had not committed the robbery. Thus the identity of the armed robber was the core factual issue.

To meet its burden on that issue, the government relied upon the direct identification evidence of two eyewitness-victims and circumstantial evidence from a number of sources. We summarize below the direct and circumstantial evidence introduced by the government to identify Anglin as the bank robber.

*The Robbery and the Testimony of The Eyewitnesses*

Shortly before 7:30 a.m. on April 16, 1996, several bank employees and armored car workers transformed a room at Shepherd Hall into the City College Branch of Chemical Bank. They accomplished this by entering the room, wheeling in bags of money and placing them in the tellers' work area, locking the door, and setting the burglar alarm.

At about this time, two men arrived at the entrance to Shepherd Hall. Following the usual practice, a security guard, Auria Semidey, asked them for identification and asked that they sign a registration sheet. Semidey testified that the shorter of the two men complied, but the taller one, wearing a hood that partially obscured his face and carrying a black knapsack, turned around quickly and left the building. Her suspicions aroused, Semidey called a City College police officer and gave a description of the men (although she was not able subsequently to identify any particular individual as the robber or the accomplice).

A few minutes before the Branch was scheduled to open, the Branch supervisor arrived and knocked on the door, which was still locked. Inside were four bank tellers, among them Michelle Marshall and Patrick Crowl. As one of the employees opened the door, a man (Anglin, on the government's theory of the case) came up behind the supervisor, yanked the door from her hands, pushed the barrel of a gun through the door, and forced his way into the Branch. The supervisor fled, shouting that the Branch was being robbed.

Marshall and Crowl, two of the tellers, testified at trial. They said that the intruder leveled his gun at the tellers, ordered them to get down on the floor, and instructed them not to look at him. A time came when a second person entered the Branch whom the tellers heard but did not see; this was presumably the accomplice. The robbers left with more than $610,000.

Michelle Marshall identified Anglin as the armed robber by selecting his photograph from an array she was shown during the investigation on February 19, 1997. She subsequently made an in-court identification of Anglin at trial. Marshall testified that although she dropped to the floor immediately, she was able to see the robber's face from that position, and that she stole several glances at him despite the robber's instructions not to do so. Further on the issue of identification, Marshall testified that the robber had a pronounced West Indian accent, and Anglin acknowledged during a post-arrest interview that he was born in Jamaica.

Patrick Crowl selected Anglin as the armed robber from a photo array that he viewed on the same day that Marshall did. He described himself as "very certain" of his identification at that time, his recollection "still fresh," and based upon Anglin's having stood directly in front of Crowl, "putting the machine gun in my face for about 15 seconds or more."[2] However, Crowl was unable to make an in-court identification of Anglin; he testified that no person in the courtroom resembled either the person who committed the robbery or the person he had previously identified from the photo array.

---

**2.** Unlike Marshall, Crowl did not fall to the floor as soon as the robber instructed the tellers to do so.

*Anglin's Prior Knowledge of the Bank's Operation*

The government laid the basis for an inference of Anglin's knowledge of the Branch's operation by proof that Anglin's close friend, one Marland Beckford, attended City College, collected financial aid checks there, and had been advised that the City College Branch would be open on the day it was robbed. As we observe *infra*, Beckford accompanied Anglin during the latter's purchase of an expensive automobile 10 days after the robbery.

*The Evidence of the Knapsack*

As noted, security officer Semidey's suspicions had been aroused when the larger of the two men she described left in haste when asked to identify himself before entering Shepherd Hall. She said that the man was carrying a black knapsack.

During a search of the grounds about an hour after the robbery, FBI agents found a black canvas knapsack just outside Shepherd Hall. The knapsack contained a store receipt and a Greyhound Bus Lines baggage ticket. The government proved that the store was located close to Anglin's home in Brooklyn. It also proved that the Greyhound ticket had been used by a passenger traveling from New York City to Norfolk, Virginia, in mid-March 1996, a trip the government established Anglin made at that time to visit his sister.

*Post–Robbery Cash Transactions*

The government proved at trial that Anglin worked off the books as a sign painter and lived at home with his mother. In those circumstances, the government's claim that it proved "Anglin had no legitimate source of income," Brief at 16, may be regarded as something of a stretch. Nonetheless, evidence probative of Anglin's participation in the robbery may be found in the government's proof of several sizeable cash purchases Anglin engaged in shortly after the robbery, in each instance taking pains to conceal his involvement in them.

Specifically, the government offered evidence that ten days after the robbery, Anglin negotiated the purchase of a 1990 Mercedes–Benz automobile for $16,000 or $17,000 in cash, and directed that the title and insurance policy for the car be placed in the name of a friend, one Samuel Perch. The car salesman received the cash from Beckford, Anglin's friend, who as we have seen was knowledgeable about the operations of the City College Branch. One week later, Anglin exchanged that Mercedes–Benz for a newer model at no additional cost, again placing the documents of ownership in Perch's name. And, during mid-May through early June, 1996, Anglin purchased at least $6,000 in money orders under a false name and used the money orders to purchase a Ford van. The cash sales of the Mercedes–Benz automobiles to Anglin, and Anglin's use of the money orders to purchase the Ford, were testified to by Yehezekel Tweg, Moshe Cohen, Barry Dayan, and Nicholas Kamourelis, partners or employees in the car sales companies involved. Tweg and Cohen made in-court identifications of Anglin as the individual engaged in the Mercedes–Benz transactions. They knew him as "Mike" (Anglin's first name is Michael). Dayan identified Anglin from a photo array and in open court as the individual, also known to Dayan as "Mike," who in the fall of 1996 purchased the Ford van, using money orders obtained during the spring. The money orders used to purchase the Ford were received in evidence. In addition to the four car salesmen, Perch also testified about the car purchases.

*Evidence of Anglin's Inculpatory Behavior*

The FBI's investigation eventually led to Marland Beckford. The government proved that the day after FBI agents questioned Beckford about the robbery, Anglin left New York. On March 6, 1997, a Georgia state trooper stopped Anglin in the Mercedes–Benz for speeding. Anglin was using a driver's license in the name of Thomas Brown. Anglin was arrested and subsequently was interviewed by the FBI. During that interview Anglin denied owning the Mercedes–Benz; said that it belonged to his mother's boyfriend; and claimed to have been living with his sister in Norfolk, Virginia, at the time of the robbery. At trial, Anglin's sister testified that he had been living in New York City at that time, and his mother's boyfriend

testified that the Mercedes–Benz belonged to Anglin and not to him.

## DISCUSSION

On appeal, Anglin advances four arguments. First, he challenges the sufficiency of the evidence to convict him. Second, he contends that the district court abused its discretion by not suppressing the in-court identification of Anglin made by one of the tellers, Michelle Marshall. Third, he contends that the district court committed reversible error in refusing to strike the evidence of Anglin's post-robbery cash purchases, after the government on its own motion dismissed the money laundering counts. Fourth, Anglin argues that the Sentencing Guidelines' 2–level enhancement for having "physically restrained" another individual should not have been applied by the district court on the facts of the case. We consider these contentions in turn.

### The Sufficiency of the Evidence

 Anglin challenges the sufficiency of the government's evidence to establish that he robbed the City College Branch on April 16, 1996. Anglin "carries a heavy burden in making this claim, and we must consider the evidence in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government, and [we] may overturn the conviction only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Morrison,* 153 F.3d 34, 49 (2nd Cir.1998) (citation and internal quotation marks omitted). Obedient to those well-established principles, we defer to the jury's determinations of the weight of the evidence and the credibility of witnesses, as well as to the jury's choice of the competing inferences that can be drawn from the evidence. *See id.; United States v. Matthews,* 20 F.3d 538, 548 (2d Cir.1994).

 The decisive element in the case at bar was Anglin's identity as the armed robber. "Proof of the elements of the crimes charged may be entirely by circumstantial

evidence," *Morrison,* 153 F.3d at 49, a general rule fully applicable to cases turning upon the identity of the criminal actor, *see United States v. Kwong,* 14 F.3d 189, 193 (2d Cir. 1994) ("Of course, there is no rule of law that requires identity to be established by an eyewitness. Identity can be inferred through circumstantial evidence.")

 Here the government relies upon eyewitness testimony and a considerable body of circumstantial evidence identifying Anglin as the City College Branch robber. Anglin seeks to blunt the eyewitness identifications by arguing that Crowl had a better opportunity to observe the robber's face than did Marshall, and yet could not make an in-court identification of Anglin, whereas Marshall could and did. Anglin also stresses certain differences in the descriptions given by the two tellers. The force of these arguments is considerably diminished by the fact that at a time closer to the robbery, both Crowl and Marshall had selected Anglin as the robber from photo arrays. Crowl's testimony to that effect was properly admitted, even if he could not identify Anglin in court: "A prior identification is admissible under Fed. R.Evid. 801(d)(1)(C), regardless of whether the witness confirms the identification in-court." *United States v. Salameh,* 152 F.3d 88, 125 (2d Cir.1998) (per curiam), *cert. denied sub nom. Abouhalima v. United States,* —— U.S. ——, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999). Nor is there any basis on the record to doubt the integrity of the photo array process. Prior to trial, the district court (Batts, *J.*),[3] denying a defense motion to suppress such evidence, stated that "[d]efendant advances nothing to suggest the photo array was suggestive. Furthermore, there has been no showing that anything suggestive occurred during the presentation of the array." Anglin does not appeal from the denial of that motion.

 Of course, Crowl's inability to make an in-court identification, and the discrepancies between the two tellers' descriptions of the robber, furnished defense counsel with legitimate arguments. But such arguments are "customary grist for the jury mill," *Man-*

---

3. The case had been assigned to Judge Batts at the time this motion was filed.

*son v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and unless we can say that under all the circumstances there is a very substantial likelihood of irreparable misidentification (which cannot be said here), "such evidence is for the jury to weigh.... Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature," *id.*

Moreover, the jury was entitled in law to rely upon the circumstantial evidence of identity elicited by the government. Anglin's awareness through his friend Beckford of the day and manner of the Branch's operation; the objects linking him to the knapsack found near the crime scene; his expenditure of a large sum of cash to purchase a car and money orders, in the names of other people, shortly after the robbery;[4] Anglin's departure from New York the day after the FBI interviewed Beckford about the robbery; the false name he gave to the Georgia police; and his false exculpatory statements when interviewed by the FBI:[5] all combine circumstantially to identify Anglin as the robber, or to show his consciousness of guilt, which in practical terms comes to the same thing. While this evidence may not have compelled the jury to draw the inferences of identity and guilt suggested by the government, it certainly permitted it to do so; and, viewing this proof together with the testimony of the eyewitnesses, we cannot overturn the conviction on the ground of insufficiency of evidence that Anglin robbed the City College Branch.

### The In–Court Identification

 Anglin next contends that the district court should have suppressed teller Marshall's in-court identification of him as the robber. We review a district court's decision to admit identification evidence for clear error. *See Salameh*, 152 F.3d at 125.

As noted, Marshall's prior identification of Anglin was from a photo array. Anglin argues that this furnished an inadequate basis for Marshall's in-court identification. In aid of his argument, Anglin reminds us of Judge Friendly's *dictum* in *United States v. Fernandez*, 456 F.2d 638, 641 n. 1 (2d Cir.1972):

> It is not and could not successfully be here contended that the presentation of the photographs after indictment and without the presence of counsel was per se illegal. However, prosecutors might well consider whether they would not only better protect the rights of the defendant but save themselves much needless argument if, in a case like this, where the defendant was in custody and there was no time pressure, they would have a properly conducted lineup.

(citations omitted). In his opinion in *United States v. Boston*, 508 F.2d 1171 (2d Cir.1974), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975), District Judge Frankel, sitting by designation, quoted Judge Friendly's observation in *Fernandez*, but then went on to say:

> The court has not held or intimated, however, that, as the appellants now argue, law enforcement officers must employ a lineup rather than photographs whenever a suspect is in custody and available. Indeed, the court has rejected the argument that it is prejudicial error for the trial judge to deny a defendant's request for a lineup prior to trial.

*Id.* at 1176–77.

Prior to this Court's decisions in *Fernandez* and *Boston*, the Supreme Court in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), while acknowledging that in contrast to a photographic identification "a corporeal identification ...

---

4. *See United States v. Jenkins*, 496 F.2d 57, 66–67 (2d Cir.1974) ("Hall's wife, two days after the robbery, purchased the used Eldorado for $2,199 cash, even though prior to the robbery Hall and his wife appeared to be living under conditions apparently inconsistent with possession of any wealth, all of which the jury was entitled to consider."), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). In the case at bar, the evidence depicted Anglin as an "off-the-books" sign-painter who had not reported any income during the years 1993 through 1996.

5. *See Jenkins*, 496 F.2d at 66 ("When Hall was arrested on September 21, 1972, in North Carolina he gave a false exculpatory statement to the effect that he had been in Glassboro, New Jersey, on the day of the robbery, from which the jury was entitled to infer a consciousness of guilt.").

is normally more accurate," *id.* at 386 n. 6, 88 S.Ct. 967, affirmed the propriety of photographic arrays, relying upon "a course of cross-examination at trial which exposes to the jury the method's potential for error" and explicitly declining "to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement," *id.* at 384, 88 S.Ct. 967.

▬ In the decades following these decisions, no case has departed from the rule that a witness may testify to a prior out-of-court identification based on a photo array if that array was not tainted. Each case turns on its own circumstances; but a prior identification from a photo array will be excluded only if the procedure "is so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law," *United States v. Simmons,* 923 F.2d 934, 950 (2d Cir.) (internal quotation marks omitted), *cert. denied,* 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991), a challenge that Anglin does not make on this appeal. An unbroken line of our decisions, of which *Salameh,* 152 F.3d at 125, is a recent example, permits use of a non-suggestive photo array for identification purposes and trial testimony based upon that identification. *See also United States v. Thai,* 29 F.3d 785, 807–08 (2d Cir.), *cert. denied sub nom. Lan Ngoc Tran v. United States,* 513 U.S. 977, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994); *Jarrett v. Headley,* 802 F.2d 34 (2d Cir.1986); *United States v. Archibald,* 734 F.2d 938, 940–41 (2d Cir.), *modified on other grounds,* 756 F.2d 223 (2d Cir.1984); *United States v. Bubar,* 567 F.2d 192, 197–99 (2d Cir.), *cert. denied,* 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977). If Anglin means to invite us to depart from that line of authority and declare a *per se* rule requiring identification by lineup whenever a

suspect is in custody, we decline the invitation.[6]

▬ Accordingly, even if we assume that Marshall based her in-court identification of Anglin solely on her prior out-of-court photo array identifications, the district court did not abuse its discretion in admitting Marshall's in-court identification, or, for that matter, Crowl's testimony about his prior out-of-court identification.

### The Post–Robbery Cash Expenditures

▬ Anglin contends that once the government dismissed the money laundering counts on its own motion, the district court should have stricken all the evidence of his post-robbery cash expenditures and committed reversible error when it denied Anglin's motion to do so. We disagree.

Preliminarily, Anglin states without apparent contradiction that "this was the first time that [the government] had attempted to bring money laundering charges in connection with a single criminal act." Main Brief at 29 n. 22. We accept *arguendo* this statistical factoid but attach no legal significance to it. While Anglin charges in conclusory terms that the government "improperly" used the money laundering charge to his prejudice, *id.* at 29, he does not define the nature of the impropriety, none appears on the face of the matter, and Anglin did not move in advance of trial to dismiss or sever the money laundering counts.

While Anglin is driven to argue in his reply brief that the proof of his post-robbery cash purchases "would have been legitimate evidence only of money laundering," Reply Br. at 9–10, that is clearly wrong; even Anglin acknowledges, in his main brief, that "the court would have been justified in allowing a small amount of testimony regarding those

---

**6.** It is not even clear that Judge Friendly's *dictum* in *Fernandez* would apply to the facts of this case. Judge Friendly spoke of the possible preference for a lineup "in a case ... where the defendant was in custody and there was no time pressure," 456 F.2d at 641 n. 1. In the case at bar, the robbery occurred on April 16, *1996.* According to the docket sheets, Anglin first appeared before the district court on April 24, *1997* (having been arrested by the Georgia state troop-

er on March 5, 1997). The FBI conducted its photo array procedures with the tellers in February 1997 when Anglin was still at large and there was no indication when he might be apprehended. Thus, when the photo array identifications were made, Anglin was not "in custody," and the agents could have felt a reasonable "time pressure" concern that the witnesses' memories would fade.

purchases, as evidence of unexplained wealth on the Robbery charges," Brief at 25, an unavoidable concession in the light of cases such as *Jenkins*, 496 F.2d at 66–67. *See also United States v. Trudo*, 449 F.2d 649, 651 (2d Cir.1971) (evidence of post-robbery "sudden acquisition of wealth" probative to establish defendant's identity as one of the robbers: "Trudo had a very meager income in the fall of 1969 and lived very modestly. In the weeks following the robbery there was an abrupt change in his spending habits. He purchased a used car for $500 and gave a $100 gift to a girl friend."), *cert. denied*, 405 U.S. 926, 92 S.Ct. 975, 976, 30 L.Ed.2d 799 (1972).[7]

Anglin's argument comes down to the assertions that the evidence of post-robbery cash purchases was so much more probative of money laundering than of his identity as the robber that, when the government dismissed the money laundering charges, the district court should have thrown out this evidence after them, either because the evidence was no longer relevant under Fed. R.Evid. 401 or because it failed the balancing analysis of Rule 403. In that latter regard, Anglin argues in his main brief at 25 that "the court was not justified in permitting the jury to consider the drawn out testimony of four used car salesmen, plus Samuel Perch and Elvis Demetrius."

We review the district court's rulings on relevance under Rule 401 and admissibility under Rule 403 for abuse of discretion. *See United States v. Diaz*, 878 F.2d 608, 614 (2d Cir.), *cert. denied*, 493 U.S. 993, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989) (Rule 401); *Salameh*, 152 F.3d at 110 (Rule 403). In the case at bar, after the government dismissed the money laundering counts, Judge DiCarlo heard arguments of counsel on Anglin's motion to strike the evidence in question, ultimately ruling that all the testimony remained relevant to the robbery charges and would not be stricken. We perceive no abuse.

We accept the obvious propositions that the government offered this evidence in an effort to sustain its money laundering charges, but ultimately concluded that that game was not worth the candle. But the evidence was no less probative of Anglin's participation in the robbery, and Anglin, having interposed a defense of mistaken identity, cannot be heard to limit the proof available to the government to counter the very contention urged on his behalf by counsel throughout the trial. The number of witnesses, including the four car salesmen, were necessitated by the manner in which Anglin structured the purchase of the cars. The government was entitled, if not as a practical matter required, to call them all so that the jury could fully understand the transactions.

While Anglin seems to argue that leaving this evidence in the record following dismissal of the money laundering counts was inherently prejudicial, Judge DiCarlo's instructions to the jury adequately insured against any such risk that might have existed. Before summations, he told the jury that those counts were no longer before them, admonished them not to speculate as to why that was so, and instructed them that the money laundering charges should play no part in their deliberations. He also instructed the jury that it was for them to decide whether or not the defendant had assets after the time of the robbery, whether such assets were unexplained or newly acquired, whether such assets tended to prove his participation in the alleged bank robbery, and the significance, if any, to be attached to this evidence.

These instructions, read together, sufficiently isolated for the jurors the robbery charges as the remaining ones for their deliberations and properly instructed them on the consideration they might give, in that context, to the transactions in question. Assuming without deciding that the circumstances attending the dismissal of the money laundering charges were potentially prejudicial to Anglin, the district court's instructions dealt adequately with the matter. We therefore uphold Anglin's conviction.

---

7. We regarded these expenditures as probative of Trudo's identity as one of the bank robbers, despite their modest amounts. The robbery in question occurred in rural Vermont in 1969; wealth is relative.

*The Sentencing Calculations*

■ Finally, Anglin contends that the district court erred in subjecting him to a 2–level offense enhancement under U.S.S.G. § 2B3.1(b)(4)(B) on the ground that the teller-victims were "physically restrained." We agree, vacate the sentence, and remand for resentencing.

U.S.S.G. § 2B3.1 deals with the crime of "robbery." The base · offense level is 20. U.S.S.G. § 2B3.1(a). Section 2B3.1(b)(4)(B) provides: "if any person was physically restrained to facilitate commission of the offense or to facilitate escape, increase by 2 levels." Application Note 1(i) to U.S.S.G. § 1B1.1 defines "physically restrained" as "the forcible restraint of the victim such as by being tied, bound, or locked up."

■ In *United States v. Stroud,* 893 F.2d 504 (2d Cir.1990), we noted that

the deference due a district court's determination will depend upon the relationship of the facts to the guidelines standard being applied. If the particular determination involved closely resembles a finding of fact, the court of appeals would apply the clearly erroneous test. As the determination approaches a purely legal determination, however, the court of appeals would review the determination more closely.

*Id.* at 506–07 (internal quotation and citation omitted). In this case, the pertinent facts, all derived from trial testimony, are not disputed. Those facts may be stated in a nutshell: the bank robber brandished a gun, told the tellers to get down on the floor and not move, and they did so. The question is whether the physical restraint enhancement applies to those facts, an issue that "turns primarily on the legal interpretation of a guideline term," *id.* at 507; we therefore perform a more searching review, *see id.* We hold that the enhancement does not apply to these facts.

*United States v. Rosario,* 7 F.3d 319 (2d Cir.1993) (per curiam), is our only reported case in which we have considered the applicability of § 2B3.1(b)(4)(B)'s "physical restraint" concept. We there affirmed the finding of the district court that a robber had "physically restrained" a Postal Service letter carrier when, after hitting the carrier on the head and knocking him to the floor, the robber "then immobilized the carrier by stepping on his throat while he stole the carrier's wallet and keys." 7 F.3d at 320. We made it clear that the throat-stepping provided the element of physical restraint which, because it· facilitated the robbery, triggered the enhancement. Thus we observed: "By standing on his victim's throat while committing the robbery, Rosario facilitated the commission of the offense in that the victim 'could do nothing about [his] situation because of the physical restraint.'" *Id.* at 321(quoting *United States v. Doubet,* 969 F.2d 341, 347 (7th Cir.1992)). In *Rosario* we concluded, perhaps not surprisingly, that the district court's finding that defendant "physically restrained his victim by pinning him to the ground by his neck" was not clearly erroneous. *Id.*

In *Doubet,* which we cited with approval in *Rosario, see id.,* the Seventh Circuit held that physical restraint had occurred when a bank robber led his victims "to an isolated room within a room which was effectively secured by Doubet's threats of death while carrying the sawed-off shotgun, as well as an admonition by Doubet that an armed accomplice stood guard outside the door." *Doubet,* 969 F.2d at 347. The court reasoned that "[t]his illusory accomplice, along with Doubet's actions, served as a figurative lock and key sufficient to constitute a physical restraint which facilitated the commission of the offense." *Id.*

While in *Rosario* we noted that the use of the modifier "such as" in the definition of "physical restraint" found in § 1B1.1, Application Note 1(i), "indicates that the illustrations of physical restraint are listed by the way of example rather than limitation," 7 F.3d at 320–21 (citation and internal quotation marks omitted), the conduct involved in that case ("pinning [the victim] to the ground by his neck") is entirely compatible with the Application Note's examples of physical restraint ("being tied, bound, or locked up").

For the most part, other circuits imposing the physical restraint enhancement have required proof of comparable circumstances. *See United States v. Nelson,* 137 F.3d 1094, 1112 (9th Cir.) ("In this case, it is uncontro-

verted that Lott ordered a jewelry store employee and customer to the back room at gunpoint. This constitutes physical restraint."), *cert. denied,* —— U.S. ——, 119 S.Ct. 232, 142 L.Ed.2d 190 (1998); *United States v. Jones,* 32 F.3d 1512, 1519 (11th Cir.1994) (per curiam) ("In this case, the credit union employees and customers were forced at gunpoint into the safe room and ordered to lie face down on the floor. The robbers then closed the door to the room and left."); *United States v. Robinson,* 20 F.3d 270, 279 (7th Cir.1994) (spraying of mace effected physical restraint because it prevented the victim from chasing after the robber and impeded the victim's movement for some time); *United States v. Schau,* 1 F.3d 729 (8th Cir.1993) (per curiam) (defendants, while carrying firearms, ordered their victims into a bank vault and wedged a chair against the vault door when it would not lock); *Doubet,* 969 F.2d at 347 (robber confined victims in "an isolated room within a room.").

The only arguably contrary decision is *United States v. Thompson,* 109 F.3d 639 (9th Cir.1997), where the Ninth Circuit said the bank robber "either repeatedly forced [one victim] to get down on the floor and get up again at gunpoint, or he forced [a second victim] to walk from the teller area to the vault area at gunpoint.... *[E]ither one* of those acts, standing alone, amounted to physical restraint of a victim." *Id.* at 641 (emphasis added). The government contends that *Thompson*'s alternative holding with regard to "repeatedly" forcing an individual to get down and get up supports the enhancement here. Assuming that we would agree that such repeated instructions would suffice, we decline to extend that interpretation to authorize the enhancement where, as here, the defendant has told the tellers to get down once.

We think that displaying a gun and telling people to get down and not move, without more, is insufficient to trigger the "physical restraint" enhancement. Such conduct is materially different from the Guidelines examples, each of which involves a restraint of movement by the use of some artifact by which the victim is "tied" or "bound" (the *Rosario* robber's foot on the victim's neck being analogous to a rope), or by the use of a space where the victim is "locked up," as in the cited cases from other circuits. The Application Note examples, while not imposing inflexible limitations upon the phrase "physical restraint," nonetheless are intended as meaningful signposts on the way to understanding the Sentencing Commission's enhancement purpose; and the government's interpretation disregards those signposts.

It also disregards the plain meaning of words. In the phrase in question, "physical" is an adjective which modifies (and hence limits) the noun "restraint." "Restraint" is defined as "a restraining ·or being restrained," "something that restrains, as an *influence or action,*" "a loss of or limitation of liberty; confinement." *Webster's Deluxe Unabridged Dictionary* (1979) at 1544 (emphasis added).[8] The root of the noun "restraint" is the verb "restrain," whose first definition is "to hold back; to check; to hold from action, proceeding, or advancing, *either by physical or moral force,* or by any interposing obstacle ... " *Id.* (emphasis added). The most pertinent definition of "physical" is "of the body as opposed to the mind, as, *physical* exercise." *Id.* at 1353. Thus "restraint" is a condition capable of being brought about by a number of forces—physical, mental, moral, singly or in combination; consequently the susceptibility of individuals to restraint is not uniform. Precisely the same set of circumstances may restrain the timid (or prudent or moral) from action, while having no restraining effect upon the bold (or foolhardy or amoral). Clearly the Sentencing Commission intended a more precise concept; if § 2B3.1(b)(4)(B) said only that the enhancement would apply "if any person was restrained," the courts would become involved in mental, moral, philosophical, even theological considerations, in addition to physical ones. No, the restraint must be "physical"; and while we do not doubt that the City College Branch robber's conduct caused the City College tellers to feel restraint, they were not subjected to physical

---

8. These are three of the five definitions given, and the most apposite to the present context.

restraint, as we interpret the Guideline's use of that phrase.

If the government's interpretation was correct, virtually every robbery would be subject to the 2–level enhancement for physical restraint unless it took place in unoccupied premises.[9] Bank robbers may surely be expected, after displaying a weapon, to say to tellers or customers, in substance, "this is a holdup, don't move." It would require a quixotic robber to display his gun, and then say to the tellers or bank customers, "this is a holdup, but feel free to move about the bank, and if any of you have to leave for an appointment elsewhere, that's fine." Accordingly, the practical effect of defining "physical restraint" so inclusively is to increase the Guidelines' base level, in what one would expect to be the considerable majority of robbery cases, from 20 to 22, a problematic effect for a provision drafted to deal with a special circumstance.

We conclude that the Sentencing Commission, in crafting § 2B3.1(b)(4)(B)'s 2–level enhancement "if a person was physically restrained," and defining that phrase in the Application Note as "the forcible restraint" of a victim, contemplated a more narrow set of circumstances. The district court erred in applying the enhancement to the facts of this case.

We therefore affirm Anglin's conviction, vacate his sentence, and remand the case to the district court for resentencing consistent with this opinion.

So Ordered.

---

9. We also note that robberies committed with a firearm already are subject to various other enhancements under U.S.S.G. § 2B3.1(b)(2).